Robert Dean MATTIS, M.D., Appellant,

v.

Richard R. SCHNARR and Robert Marek, Appellees,

v.

John C. DANFORTH, Attorney General, State of Missouri, Intervenor-Appellee.

No. 75–1849.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 17, 1976.

Decided Dec. 1, 1976.

Gibson, Chief Judge, dissented and filed an opinion in which Stephenson and Henley, JJ., concurred.

Eugene H. Buder, St. Louis, Mo., for appellant; Richard D. Baron, American Civil Liberties Union of Eastern Missouri, St. Louis, Mo., Joel M. Gora, American Civil Liberties Union, New York City, and Benjamin Roth, American Civil Liberties Union of Eastern Missouri, St. Louis, Mo., on brief.

Robert L. Presson, Asst. Atty. Gen., Jefferson City, Mo., John C. Danforth, Atty. Gen., Jefferson City, Mo., on brief.

Before GIBSON, Chief Judge, and LAY, HEANEY, BRIGHT, ROSS, STEPHEN-

SON and HENLEY, Circuit Judges, en banc.*

HEANEY, Circuit Judge, with whom LAY, BRIGHT and ROSS, Circuit Judges, concur.

This appeal concerns the constitutionality of Missouri statutes [1] which permit law enforcement officers to use deadly force to effect the arrest of a person who has committed a felony if the person has been notified that he or she is under arrest and if the force used is restricted to that reasonably necessary to effect the arrest.[2] We hold the statutes unconstitutional as applied to arrests in which an officer uses deadly force against a fleeing felon who has not used deadly force in the commission of the felony and whom the officer does not reasonably believe will use deadly force against the officer or others if not immediately apprehended.

The challenge to the constitutionality of the Missouri statutes arose out of the killing of Michael Mattis by Robert Marek, a police officer.

Michael Mattis, age eighteen, and Thomas Rolf, age seventeen, were discovered in the office of a golf driving range at approximately 1:20 A.M. by police officer, Richard Schnarr. Shortly thereafter, the two boys left the office by climbing out through the back window. Schnarr shouted at the boys to halt. They ran in different directions. Schnarr then shouted, "Halt or I'll shoot" two times. When the boys failed to stop, he fired one shot into the air and one shot at Rolf. Meanwhile, Officer Robert Marek, who had arrived on the scene, ran to intercept the boys. He collided with Mattis as he came around the corner of the building. Both fell to the pavement. Marek grabbed Mattis by the leg. Mattis broke away. Marek ran after him. Marek was losing ground. He shouted, "Stop or I'll shoot." Mattis did not stop. Marek, believing it was necessary to take further action to prevent Mattis's escape, fired one shot in the direction of Mattis and killed him. Both officers believed that the use of their guns was reasonably necessary to effect an arrest and was authorized by valid Missouri statutes.

Robert Dean Mattis, the father of Michael, brought an action against the officers and the City of Olivette under 42 U.S.C. §§ 1983 and 1988, V.A.M.S. § 537.080, 28 U.S.C. §§ 1343(4), 2201 and 2202, and the Constitution of the United States, Amendments XIV, VIII and IX. It is alleged in the complaint that the officers, acting under color of law, deprived Michael Mattis of his life without due process of law, deprived him of the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution, and inflicted a cruel and unusual punishment on him in violation of the Fourteenth, Eighth and Ninth Amend-

---

* WEBSTER, Circuit Judge, did not participate in the above opinion.

1. *Justifiable Homicide*

Homicide shall be deemed justifiable when committed by any person in either of the following cases:

     \*     \*     \*     \*     \*     \*

(3) When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed, or in lawfully \* \* \* keeping or preserving the peace.
V.A.M.S. § 559.040.

*Rights of officer in making arrests*

If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest.
V.A.M.S. § 544.190.

2. "Deadly force" is not defined in either of the challenged statutes. We use the term in this opinion as it is used in the Model Penal Code § 3.11(2) (1962):

"deadly force" means force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force.

*See also* Comment, *Deadly Force to Arrest: Triggering Constitutional Review,* 11 Harv.Civ. Rights-Civ.Lib.L.Rev. 361, 363 (1976) [hereinafter cited as Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev. 361]:

[D]eadly force is such force as under normal circumstances poses a high risk of death or serious injury to its human target, regardless of whether or not death, serious injury or any harm actually results in a given case.

ments of the Constitution. The court was asked to declare V.A.M.S. §§ 559.040 and 544.190 unconstitutional and to award damages of $100.00.

The officers asserted in their answer that the statutes had been construed by the Missouri courts to authorize police officers to use deadly force to prevent the escape of a person fleeing from a lawful arrest after committing a felony. They further asserted that any acts performed by them were done in good faith and in reliance on the laws of Missouri which they had probable cause to believe were constitutional.[3] The trial court dismissed the case holding that Robert Mattis did not have standing to bring the action and that defenses of good faith and probable cause were available to the officers. *Mattis v. Kissling, et al.,* Civil No. 72–Civ. (3) (E.D.Mo., filed January 16, 1973).

Robert Mattis appealed to this Court. We held that he had standing, that the defenses of good faith and probable cause were available to the officers insofar as the action for damages was concerned, but were unavailable insofar as declaratory relief was concerned. We remanded the matter with directions to the trial court to determine the constitutionality of the statutes in question. We directed that the Attorney General of the State of Missouri be given an opportunity to intervene pursuant to Fed.R.Civ.P. 24. *Mattis v. Schnarr,* 502 F.2d 588 (8th Cir. 1974).

After remand, Robert Mattis filed a second amended complaint. It substantially tracked the earlier complaints.[4] The State of Missouri filed an answer admitting that Michael Mattis was shot and killed by Officer Marek while Mattis was attempting to escape from an arrest sought to be made on suspicion of burglary, a felony under Missouri law. The answer also asserted that V.A.M.S. §§ 559.040 and 544.190, as construed by the Supreme Court of Missouri to authorize the use of deadly force by police officers if reasonably necessary to prevent a felon but not a misdemeanant[5] from escaping, are constitutional.

The District Court entered a judgment upholding the constitutionality of the statutes. In discussing the due process claim, it stated:

> Constitutional rights are not absolute; where conflict arises between assertions of rights, there must be a balancing of the public interest and the individual's rights. * * *
>
> Here the claims of parental rights must be weighed against the interest of the state in apprehending criminals and in aiding police officers in the fulfillment of this duty. The dangers faced by the police are not to be minimized. * * * To restrict the means available to the police to effectuate an arrest is to reduce the effectiveness of the officers in the pursuit of their duties. * * *
>
> *     *     *     *     *     *
>
> The competing interests here involve two different areas of concern; plaintiff asserts a right to raise a family and to have his parental rights continue until terminated by due process of law while the state asserts an interest in aiding police officers in apprehending criminal suspects. While neither assertion of right is to be taken lightly, it is this Court's opinion that plaintiff's claims of parental rights must yield to the state's overriding interest as determined by the legislature.

*Mattis v. Schnarr,* 404 F.Supp. 643, 646–647 (E.D.Mo.1975).

---

3. The local police department had issued no instructions to its officers on the circumstances under which they could use their firearms.

4. The claim for damages was dropped and other minor changes were made. An allegation that the statutes were void for vagueness was added.

5. The state cites *Manson v. Wabash Railroad Co.,* 338 S.W.2d 54 (Mo.1960); *State v. Browers,* 356 Mo. 1195, 205 S.W.2d 721 (1947) and *State v. Ford,* 344 Mo. 1219, 130 S.W.2d 635 (1939), in support of its position. We agree that the statutes have been so construed.

With respect to the equal protection claim, it stated that the statutory classification was reasonable and as free from arbitrariness as any other suggested classification.

The court, in discussing the cruel and unusual punishment claim, stated that the issue was whether the use of deadly force against fleeing felons by police officers "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). It pointed out that thirty-four states authorized the use of the force sought to be condemned here and declared that this fact gave credence to the proposition that the limits of civilized standards had not been exceeded.

The court concluded by noting:

To abolish the use of deadly force altogether is to deprive the state and its citizens of their rights to security, safety and a feeling of protection. To pick and choose those crimes warranting the application of these statutes is the duty of the legislature. It involves a determination of the effect and seriousness of crimes on society and such a determination lies exclusively within the province of the legislative branch. It is not the role of a federal judge to legislate for the people of a state.

The court dismissed the action. *See Mattis v. Schnarr, supra* at 651.

This appeal followed.

We emphasize initially that no claim is made that the statutes are unconstitutional insofar as they permit police officers to use deadly force where reasonably necessary to effect the arrest of a fleeing felon who has used or has threatened to use deadly force in the commission of the felony for which he or she is being apprehended or insofar as they permit such force to be used to apprehend a fleeing felon whom the officers reasonably believe will use deadly force against the arresting officers or others if he or she is not immediately apprehended. The claim is the narrower one that the statutes are unconstitutional as applied to fleeing felons suspected of a nonviolent felony whom the officers do not reasonably believe will use deadly force against the officers or others.[6]

We also emphasize that we are not concerned in this case with whether the force used was that reasonably necessary to effect the immediate arrest of the fleeing Michael Mattis. It was necessary if Michael was to be apprehended at that time. The question is, rather, whether deadly force could constitutionally be used to effect the arrest of this fleeing eighteen-year-old burglar who threatened no one's life during the commission of the burglary and posed no threat to the apprehending officers or others.

With the issue thus defined, we turn to a brief discussion of common and statutory law, scholarly opinion and present police practice with respect to the use of deadly force.

■ At common law, deadly force could be used by a law enforcement officer if necessary to effect the arrest of a felony suspect but not of a suspected misdemeanant.[7] While the rule has been severely crit-

---

**6.** This classification of crime follows that used in U. S. Federal Bureau of Investigation, *Crime in the United States—Uniform Crime Reports*—1973, 1 (1973), which classifies crime into violent (homicide, forcible rape, robbery, and aggravated assault), property (including auto theft, theft, burglary, and other forms of breaking and entering), and other offenses. Other crimes—embezzlement, forgery, or narcotics violations—can be used as examples in arguing that allowing deadly force against all felons is irrational, but it is extremely unlikely for deadly force to be used in the arrest of such criminals.

Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev., *supra* at 364 n.10.

**7.** This rule reflected the social and legal context of felonies in 15th century England and 18th century America. Since all felonies—murder, rape, manslaughter, robbery, sodomy, mayhem, burglary, arson, prison break, and larceny—were punished by death, the use of deadly force was seen as merely accelerating the penal process, albeit without providing a trial. "It made little difference if the suspected felon were killed in the process of capture, since, in the eyes of the law, he had already

icized by legal scholars, most jurisdictions governed by common law have continued to adhere to the distinction.[8] As early as 1887, however, Judge Brown, of the Eastern District of Michigan, later appointed to the Supreme Court of the United States, stated:

> I doubt, however, whether this law would be strictly applicable at the present day. Suppose, for example, a person were arrested for petit larceny, which is a felony at the common law, might an officer under any circumstances be justified in killing him? I think not. The punishment is altogether too disproportioned to the magnitude of the offense.

*United States v. Clark*, 31 F. 710, 713 (Cir. Ct., E.D.Mich.1887).

forfeited his life by committing the felony." It was also assumed that a suspected felon facing death upon capture was more desperate than a misdemeanant and that greater force was required for his apprehension. Finally, because there was no network of police forces a felon eluding his initial pursuers would probably escape ultimate arrest. Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev., *supra* at 365 (footnotes omitted). *See also* 4 W. Blackstone, Commentaries *180; Greenstone, *Liability of Police Officers for Misuse of Their Weapons*, 16 Clev.-Mar.L.Rev. 397 (1967); Note, *Justification: The Impact of the Model Penal Code on Statutory Reform*, 75 Colum.L.Rev. 914 (1975); Comment, *The Use of Deadly Force in the Protection of Property Under the Model Penal Code*, 59 Colum.L.Rev. 1212, 1218 n.35 (1959); Tsimbinos, *The Justified Use of Deadly Force*, 4 Crim.L.Bull. 3 (1968); McDonald, *Use of Force by Police to Effect Lawful Arrest*, 9 Crim.L.Q. 27 (1967); Perkins, *The Law of Arrest*, 25 Iowa L.Rev. 201 (1940); Comment, *The Use of Deadly Force in Arizona by Police Officers*, 1973 L. & Soc. Order 481, 482 (1973); Pearson, *The Right to Kill in Making Arrest*, 28 Mich.L.Rev. 957 (1930); Wilgus, *Arrest Without a Warrant*, 22 Mich.L. Rev. 541, 569 (1924); Moreland, *The Use of Force in Effecting or Resisting Arrest*, 33 Neb. L.Rev. 408 (1954); Note, *Criminal Law—Use of Deadly Force in Preventing Escape of Fleeing Minor Felon*, 34 N.C.L.Rev. 122 (1955); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan.L.Rev. 566 (1961); Bohlen & Shulman, *Arrest With and Without a Warrant*, 75 U.Pa.L.Rev. 485, 495 (1927); Note, *Legalized Murder of a Fleeing Felon*, 15 Va.L.Rev. 582 (1929); Note, *Justifiable Use of Deadly Force by the Police: A Statutory Survey*, 12 Wm. & Mary L.Rev. 67 (1970)

At least twenty-four states, including five in this Circuit—Arkansas, Iowa, Minnesota, Missouri, South Dakota—codify the common law and provide that deadly force may be used to arrest any felony suspect.[9] Seven states depart from the common law by specifying the felonies for which deadly force may be used to arrest or by stating that only "forcible felonies" justify the use of deadly force.[10] North Dakota permits a law enforcement officer to use deadly force if that force is necessary to effect an arrest of a person who has committed or attempted to commit a felony "involving violence, or is attempting to escape by the use of a deadly weapon, or has otherwise indicated that he is likely to endanger human life or to inflict serious bodily injury unless ap-

8. *See* Comment, 11 Harv.Civ.Rights-Civ.Lib.L. Rev., *supra* at 367–368 n.28.

9. The twenty-four states, according to Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev., *supra* at 368 n.30, are:

Alaska Stat. § 11.15.090 (1970); Ariz.Rev. Stat.Ann. § 13–461 (Supp.1972); Ark.Stat. Ann. § 41–510(2)(a) (Spec. Pamphlet 1976); Cal.Penal Code § 196 (West 1970); Colo.Rev. Stat.Ann. § 18–1–707(2)(b) (1973); Conn. Gen.Stat. § 53a–22(c)(2) (1975); Fla.Stat. Ann. § 776.05 (Supp.1975); Idaho Code § 19– 610 (1970); Ind.Code § 35–1–19–3 (Burns 1975); Iowa Code § 755.8 (1971); Kan.Stat. Ann. § 21–3215(1) (1974); Minn.Stat. § 609.- 065(3) (1974); Miss.Code Ann. § 97-3-15 (1972); Mo.Rev.Stat. § 559.040 (Vernon 1969); Mont.Rev.Code.Ann. § 94-2512 (Spec. Supp.1973); Nev.Rev.Stat. § 200.140(3)(b) (1973); N.H.Rev.Stat.Ann. § 627:5(II)(b)(1) (Supp.1973); N.M.Stat.Ann. § 40A-2-7 (1963); Okla.Stat.Ann. tit. 21, § 732 (1951); R.I.Gen.Laws § 12–7–9 (1969); S.D.Comp. Laws Ann. § 22–16–32 (1967); Tenn.Code Ann. § 40–808 (1956); Wash.Rev.Code Ann. § 9.48.160 (1961), § 9A.16.040(3) (1975) (effective July 1, 1976); Wis.Stat. § 939.45(4) (1973).

10. According to the same source, these states are:

Ga.Code Ann. § 26–902 (1972); Ill.Rev. Stat. ch. 38, § 7–5(a)(2) (1973); N.Y. Penal Law § 35.30(1)(a)(ii) (McKinney Supp.1971); N.D.Cent.Code § 12.1–05–07(2)(d) (1975); Ore.Rev.Stat. § 161.239 (1973); Pa.Stat.Ann. tit. 18, § 508(a)(1)(ii) (1973); Utah Code Ann. § 76–2–404(2)(b) (Supp.1975). *Id.* at n.31.

prehended without delay." N.D.Cent.Code § 12.1–05–07(2)(d) (1975). Another seven states,[11] including Nebraska of this Circuit, have adopted the Model Penal Code approach, which permits the use of deadly force only when the crime for which the arrest is made involves conduct including use or threatened use of deadly force or when there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.[12]

The President's Commission on Law Enforcement and Administration of Justice, the National Commission on Reform of Federal Criminal Laws,[13] and legal

11. According to the same source, these states are:

Del.Code Ann. tit. 11 § 467(c) (1974); Hawaii Laws, Act 9, ch. 3 (1972) (effective 1973) § 307(3); Ky.Rev.Stat. § 503.090(2) (1975); Maine Rev.Stat.Ann. tit. 17A § 107–2(B) (1975) (effective March 1, 1976); Neb.Rev. Stat. § 28–839(3) (Supp.1974); Tex.Penal Code art. 2, § 9.51(c) (1974). North Carolina allows the use of deadly force to arrest one fleeing from a felony with a deadly weapon in addition to those situations in which the Model Penal Code formulation authorizes deadly force. N.C.Gen.Stat. § 15A–401(d)(2)(b) (1973).

New York adopted the Model Penal Code approach in 1965 but returned to the forcible felony rule in 1967. *See* Leibovitz, [*Justifiable Use of Force Under Article 35 of the Penal Law of New York*, 18 Buffalo L.Rev. 285, 290–295 (1969)]. Idaho adopted the Model Penal Code in 1971 but repealed it three months after its effective date in 1972. *See* [Note, *Justification: The Impact of the Model Penal Code on Statutory Reform*, 75 Colum.L.Rev. 914] at 915 n.4; Stone & Hall, *The Model Penal Code in Idaho?*, 8 Idaho L.Rev. 221 (1972).

*Id.* at 369 nn.32 & 33. *See also* 4 Crim.L.Bull., *supra* note 7, at 11.

12. § 3.07. *Use of Force in Law Enforcement*

(1) *Use of Force Justifiable to Effect an Arrest.* Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward the person of another is justifiable when the actor is making or assisting in making an arrest and the actor believes that such force is immediately necessary to effect a lawful arrest.

(2) *Limitations on the Use of Force.*

(a) The use of force is not justifiable under this Section unless:

(i) the actor makes known the purpose of the arrest or believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and

(ii) when the arrest is made under a warrant, the warrant is valid or believed by the actor to be valid.

(b) The use of deadly force is not justifiable under this Section unless:

(i) the arrest is for a felony; and

(ii) the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and

(iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and

(iv) the actor believes that:

(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

(3) *Use of Force to Prevent Escape from Custody.* The use of force to prevent the escape of an arrested person from custody is justifiable when the force could justifiably have been employed to effect the arrest under which the person is in custody, except that a guard or other person authorized to act as a peace officer is justified in using any force, including deadly force, which he believes to be immediately necessary to prevent the escape of a person from a jail, prison, or other institution for the detention of persons charged with or convicted of a crime.

Model Penal Code § 3.07 (1962).

13. § 607. *Limits on the Use of Force: Excessive Force; Deadly Force.*

\* \* \* \* \* \*

(2) Deadly Force. Deadly force is justified only in the following instances:

\* \* \* \* \* \*

(d) when used by a public servant authorized to effect arrests or prevent escapes, if such force is necessary to effect an arrest or to prevent the escape from custody of a person who has committed or attempted to commit a Class A or B felony involving violence, or is attempting to escape by the use of a deadly weapon, or has otherwise indicated that he is likely to endanger human life or to inflict serious bodily injury unless apprehended without delay[.]

The National Commission on Reform of Federal Criminal Laws, Study Draft of a New Federal Criminal Code (Title 18, U.S.C.) (1970). The recommendations of the Commission have been incorporated into the Criminal Justice Reform Act of 1975 authored by Senators McClellan, Hruska, Bayh, Eastland, Fong, Griffin, Mansfield, Moss, Hugh Scott, Taft and Tower. 121 Cong.Rec. 29 (early ed. Jan. 15, 1975). This bill is intended to be a recodification of the federal criminal laws. The quoted section does

scholars [14] whose writings span the last five decades generally support a rule which would limit the use of deadly force by police officers to those circumstances where the use of force is essential to the protection of human life and bodily security, or where violence was used in committing the felony.

The reasons advanced by the President's Commission are particularly important. The Commission found, through its studies, that

[p]olice use of firearms to apprehend suspects often strains community relations or even results in serious disturbances. * * *

When studied objectively and unemotionally, particular uses of firearms by police officers are often unwarranted. * * *

* * * * * *

It is surprising and alarming that few police departments provide their officers with careful instruction on the circumstances under which the use of a firearm is permissible. * * *

It is essential that all departments formulate written firearms policies which clearly limit their use to situations of strong and compelling need. * * *

1. Deadly force should be restricted to the apprehension of perpetrators who, in the course of their crime threatened the use of deadly force, or if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if this apprehension is delayed. The use of fire-

arms should be flatly prohibited in the apprehension of misdemeanants, since the value of human life far outweighs the gravity of a misdemeanor.

* * * * * *

5. Officers should be allowed to use any necessary force, including deadly force, to protect themselves or other persons from death or serious injury. In such cases, it is immaterial whether the attacker has committed a serious felony, a misdemeanor, or any crime at all.

The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police, 189–190 (1967) (footnote omitted).

More recent studies indicate that an important factor in increasing community tensions is that there is often a disproportionate use of deadly force against non-white suspects.[15]

Professor Michael Mikell has challenged the legal basis for permitting deadly force to be used against fleeing nonviolent felons since neither their original offense or their flight is ever punishable by death. His statement at the American Law Institute Proceeding in 1931 puts the matter aptly:

It has been said, "Why should not this man be shot down, the man who is running away with an automobile? Why not kill him if you cannot arrest him?" We answer: because, assuming that the man is making no resistance to the officer, he does not deserve death * * * May I ask what we are killing him for when he

---

not appear to have been a controversial one. Hearings on Reform of the Federal Criminal Laws Before the Subcomm. on Criminal Laws and Procedures of the Senate Comm. on the Judiciary, 92nd Cong., 2nd Sess. at 3493 (1972).

**14.** See note 7, supra at 1011–1012.

**15.** The Metropolitan Applied Research Center, Inc., conducted a study, in 1974, which showed that of 248 persons killed by the New York City Police from 1970 through 1973, seventy-three percent were black or Puerto Rican and under thirty years of age.

A similar study conducted of the Chicago Police Department, entitled The Police and Their Use of Fatal Force, concluded:

Blacks were more than six times as likely to die at the hands of police as were whites during the period surveyed.

[I]ndividuals under 25 remained twice as likely to die at the hands of the police as those over 25.

Id. at 27.

From 1950 through 1960, the death rate for blacks at the hands of police was nine times higher than that for whites in Akron, Chicago, Kansas City, Miami, Buffalo, Philadelphia, Boston and Milwaukee. Robin, Justifiable Homicide By Police Officers, 54 J. of Crim.L., Criminology and Police Science 225, 229 (1963). In any given year, an Akron police officer was forty-five times more likely to kill a fleeing felon than a Boston police officer. Id.

steals an automobile and runs off with it? Are we killing him for stealing the automobile? If we catch him and try him, we throw every protection around him. We say he cannot be tried until 12 men of the grand jury indict him, and then he cannot be convicted until 12 men of the petit jury have proved him guilty beyond a reasonable doubt, and then when we have done all that, what do we do to him? Put him before a policeman and have a policeman shoot him? Of course not. We give him three years in a penitentiary. It cannot be then that we allow the officer to kill him because he stole the automobile, because the statute provides only three years in a penitentiary for that. Is it then for fleeing? And again, I insist this [is] not a question of resistance to the officer. Is it for fleeing that we kill him? Fleeing from arrest is also a common law offense and is punishable by a light penalty, a penalty much less than that for stealing the automobile. If we are not killing him for stealing the automobile and are not killing him for fleeing, what are we killing him for? [16]

9 ALI Proceedings 186–187 (1931).

And Judge Learned Hand, who participated in the efforts of the American Law Institute to develop a policy with respect to the use of deadly force, stated:

Mr. President, may I say a word? It has been constantly supposed here that if you are able to shoot a robber you are less likely to have a robber. I question that. I challenge it altogether. I don't believe that possibility figures at all in the commission of crime.

If not, then I submit it is merely a question as to whether, in order to save your own property, you may kill another man. And people will differ about that. I feel very strongly that you ought not to have that privilege and to do so would be to go back a step toward, at least, an era of violence. [17]

35 ALI Proceedings 298 (1958).

The Federal Bureau of Investigation by Memorandum 31–72, dated November 21, 1972, adopted the following policy with respect to the use of firearms:

It is the policy of the Bureau that an Agent is not to shoot any person except, when necessary, in self-defense, that is, when he reasonably believes that he or another is in danger of death or grievous bodily harm.

Self-defense was defined by Mr. Justice Holmes, in language with which the courts still agree, as follows:

"Many respectable writers agree that if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant, he may stand his ground, and that if he kills him, he has not exceeded the bounds of lawful self-defense. That has been the decision of this Court." *Brown v. U. S.,* 256 U.S. 335, 41 S.Ct. 501, 65 L.Ed. 961 (1921).

The term "self-defense" also includes the right to defend another person against what is reasonably perceived as an immediate danger of death or grievous bodily harm to that person from his assailant. 40 *American Jurisprudence* 2d, 170–171.

I want to reiterate that emphasis must be placed on planning arrests so that maximum pressure is placed on the individual being sought, and he has no opportunity either to resist or flee. Any situa-

---

**16.** Under Missouri law, the maximum penalty that Michael Mattis could have received had he been found guilty of committing second degree burglary would have been ten years imprisonment in the state penitentiary. V.A.M.S. § 560.095(2). There appears to be no Missouri statute that specifically applies to simple flight from arrest. V.A.M.S. §§ 557.200 and 557.210, which deal with resisting arrest, have not been construed to include simple flight from arrest. The most nearly applicable statute is V.A.M.S. § 557.390, which proscribes escape from the custody of an officer once it has been established. It is punishable by not more than two years in the state penitentiary.

**17.** While Judge Learned Hand's words were specifically directed towards the right of a private citizen to defend his own property, it is clear from reading the entire transcript that he was speaking to the larger problem of justification to use deadly force. 35 ALI Proceedings 258–334 (1958).

tion of this type can deteriorate in an instant, and continuing alertness, extreme care, and good judgment are necessary to enable our Agents to control the situation. If a subject initiates action which may cause physical harm, there should be no hesitancy in using such force as is necessary to bring the subject under control effectively and expeditiously.[18]

A number of local law enforcement agencies have adopted policies similar to those recommended by the Model Penal Code.[19]

The foregoing review clearly establishes that the historical basis for permitting the use of deadly force by law enforcement officers against nonviolent fleeing felons has been substantially eroded,[20] that federal and many state and local law enforcement agencies prohibit the use of deadly force against such felons except where human life is threatened, and that the policy of permitting deadly force to be used against all fleeing felons contributes little or nothing to public safety or the deterrence of crime. Instead, the use of deadly force often tends to increase hostility towards law enforcement and to exacerbate community tensions. In short, there is little or no informed contemporary support for statutes as broad as these are. Moreover, no evidence was introduced below, either by the defendants or the intervening State of Missouri, indicating that a societal purpose is served by statutes as broad as these two.

However, it is not for this Court to decide whether the Missouri statutes are wise or

---

**18.** The Bureau of Narcotics and Dangerous Drugs has adopted similar regulations:

An agent will not shoot at any person except to protect his own life or that of some other person.

Agents will not fire at fleeing suspects or fleeing defendants, agents will not fire at a fleeing automobile being used simply as a means of escape.

The firing of warning shots is prohibited.

Agents will not remain passive in a threatening situation. However, the agent will ensure that he has made an accurate assessment of the situation in considering the use of firearms.

Firearms will not be utilized to coerce or intimidate suspects or defendants who are not threatening an agent or another person. *Internal Regulations, Bureau of Narcotics and Dangerous Drugs,* December, 1971.

**19.** The Planning and Research Division of the Boston Police Department released a study on May 3, 1974, in which it was reported that a majority of the large cities permit officers to fire their weapons only if the perpetrator has, in the process of committing an offense, presented a threat of serious injury or death to someone. In some of these cities, deadly force may be used against individuals who are suspected of committing only certain specified crimes. Washington, D.C., San Francisco, Dallas, Philadelphia, Oakland, Atlanta, New Orleans, Honolulu and Phoenix permit such force to be used only in cases of homicide, robbery, rape, arson and kidnapping. Chicago, Seattle, Memphis and Buffalo authorize the use of deadly force in cases of burglary, breaking and entering and various assaults with intent. *See* Boston Police Department, Planning & Research Division, *The Use of Deadly Force by Boston Police Personnel,* May 3, 1974. The St.

Louis, Missouri, Police Department Rule 46, on the other hand, permits firearms to be discharged when reasonably necessary to effect the capture of a person whom the officer has probable cause to believe has committed a felony.

The Minnesota Highway Patrol and the sheriff's departments of Hennepin and Ramsey Counties, the two most populous counties in the state of Minnesota, have adopted rules that closely follow the Model Penal Code. *See Schumann v. McGinn,* Minn., 240 N.W.2d 525 (1976). The Los Angeles Police Department and the District of Columbia Metropolitan Police Department have adopted similar rules.

A study published in the Journal of Police Science and Administration, entitled *An Approach to the Problem of Excessive Force by Police,* concludes that the excessive use of force can be diminished by improved selection, supervision and training of police officers. *Id.* at Vol. 3, No. 4, p. 380 (1975).

**20.** Even if this were not the case,

[i]t is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.

*Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). *See also Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

not. The sole question before this Court is whether the statutes are unconstitutional. We hold they are.[21]

We are concerned with the right of an individual to life,[22] expressly recognized in the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, which respectively ordain:

> No person shall * * * be deprived of life, liberty, or property, without due process of law[.]

U.S.Const. Amend. V; and

> nor shall any State deprive any person of life, liberty, or property, without due process of law[.]

**21.** We are aware other courts have reached a contrary conclusion. In *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971), a three-judge court sitting in the Western District of Tennessee held that a Tennessee statute similar to the Missouri one was not violative of the Eighth Amendment, was not unconstitutional, overbroad or vague and was not violative of the equal protection clause of the Fourteenth Amendment. A similar result was reached in *Wiley v. Memphis Police Dep't,* Civil No. C–73–8 (W.D.Tenn., filed June 30, 1975, as amended, July 27, 1975), *appeal docketed,* No. 75–2321 (6th Cir., Nov. 13, 1975). *See also Jones v. Marshall,* 528 F.2d 132 (2nd Cir. 1975); *Beech v. Melancon,* 465 F.2d 425 (6th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973).

In *Wolfer v. Thaler,* 525 F.2d 977 (5th Cir.), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1976), the Court affirmed a dismissal of a § 1983 action brought against a police officer on the ground that while the victim's father and mother did have standing to bring the action, that the Texas law had been amended after the shooting incident occurred.

*But see Autry v. Mitchell,* 420 F.Supp. 967 (E.D.N.C.1976) (three judge court) which held that a North Carolina statute, which permitted killing without warning any felon against whom there had been an *ex parte,* proclamation of outlawry, to be violative of the due process and the equal protection clauses of the Fourteenth Amendment.

**22.** The appellant is asserting the right to parenthood, which this Court has held to be fundamental. *Mattis v. Schnarr,* 502 F.2d 588, 595 (8th Cir. 1974). That right encompasses the right of the appellant to raise the issue of his son's right to life and to challenge the constitutionality of the statutes which permit the use of deadly force.

U.S.Const. Amend. XIV.

Clearly, the right to life is "fundamental,"[23] and has often been so recognized in the equal protection and due process contexts.

As early as 1886, the Supreme Court in *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), spoke of the fundamental rights "to life, liberty and the pursuit of happiness." Again, in *Johnson v. Zerbst,* 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938), the Court spoke of "the fundamental human rights of life and liberty." In *Screws v. United States,* 325 U.S. 91, 123, 65 S.Ct. 1031, 1046, 89 L.Ed. 1495 (1945), Mr. Justice Rutledge, concurring, stated:

> The court below and the court in *Cunningham v. Ellington, supra,* found that the right to life was not involved and that what was at issue was a right to flee. We disagree. It is conceded that Michael Mattis did not have a right to burglarize the office of the golf driving range and that he did not have a right to flee. The question remains, however, can his life be taken without due process if he decides to do so?

**23.** Among the rights that have been declared fundamental in equal protection analysis are the right to travel, *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1972); equal access to voting, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); and procreation, *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). *See generally San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 30–36 nn.74–76, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); Note, *Fundamental Personal Rights: Another Approach to Equal Protection,* 40 U.Chi.L.Rev. 807 (1973).

Among the rights that have been declared fundamental in due process analysis are the right to abort a pregnancy (encompassed within the right to privacy), *Roe v. Wade, supra* ; to be free of restrictive maternity leave regulations that burden "the freedom of personal choice in matters of marriage and family life," *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); and the "rights to conceive and raise one's children," *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972).

The Fifth Amendment contains a due process clause as broad in its terms restricting national power as the Fourteenth is of state power. * * * If it [the predecessor of § 242, the criminal counterpart of § 1983] is valid to assure the rights "plainly and directly" secured by other provisions, it is equally valid to protect those "plainly and directly" secured by the Fourteenth Amendment, including the expressly guaranteed rights not to be deprived of life, liberty or property without due process of law.

*Id.* at 123, 65 S.Ct. at 1046 (footnote omitted).

The dissenting views of Mr. Justice Murphy, in the same opinion, also recognized the existence of a right to life:

He has been deprived of the right to life itself. * * * That right was his because he was an American citizen, because he was a human being. As such, he was entitled to all the respect and fair treatment that befits the dignity of man, a dignity that is recognized and guaranteed by the Constitution.

*Id.* at 134–135, 65 S.Ct. at 1051.

More recently, the preeminence of life in the system of constitutional values was recognized in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), where the Court held that the Fourteenth Amendment protection of "person" constitutes a "right to life." *Id.* at 157, 93 S.Ct. 705. It reasoned that once the point of viability is reached, the fetus's right to life is guaranteed specifically by the Fourteenth Amendment.

■ Even though the right to life is fundamental, the recent Supreme Court death penalty cases [24] establish that when an offender has feloniously taken the life of another, capital punishment is not invariably disproportionate to the crime. It may be imposed without violating his Eighth or Fourteenth Amendment rights under "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976). Such punishment, of course, can only take place after the offender has been accorded due process. Due process, in the criminal context, means a trial [25] and its attendant procedural safeguards.[26]

If we were to read the due process clause literally, we would have to conclude that

**24.** *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). *See also Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

**25.** The right to a trial was considered fundamental even when Sixth Amendment guarantees were not expressly binding on the states. In *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937), the Court stated: "Fundamental too in the concept of due process, and so in that of liberty, is the thought that condemnation shall be rendered only after trial."

In *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Court described the right to counsel as being of a "fundamental character." *Id.* at 68, 53 S.Ct. 55. The Court has said of the Sixth Amendment right to counsel: "This is one of the safeguards * * * deemed necessary to insure fundamental human rights of life and liberty." *Johnson v. Zerbst,* 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938). It is now settled that Sixth Amendment rights can be abridged only in exceedingly narrow circumstances. *See, e. g., Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); *Johnson v. Mississippi,* 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971); *Harris v. United States,* 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).

**26.** These other constitutional guarantees include the right to self-representation, *Faretta v. California, supra*; the right to be presumed innocent and to have guilt proved beyond a reasonable doubt, *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); the right to the assistance of counsel, *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); the right to a jury trial where the punishment exceeds imprisonment for six months, *Duncan*

life could never be taken without a trial. Such a literal reading would fail to recognize the interests of the state in protecting the lives and safety of its citizens.

■ The District Court properly recognized that the situations in which the state can take a life, without according a trial to the individual whose life is taken, are to be determined by balancing the interests of society in guaranteeing the right to life of an individual against the interest of society in insuring public safety. It went on to hold that the task of determining how the balance should be struck was exclusively within the province of the legislature.[27] It is with the latter statement that we disagree. The legislature has an important role to play in the balancing process, but the court has the ultimate responsibility to determine whether the balance struck is a constitutional one.

■ Because we deal with a fundamental right, the Missouri statutes can be sustained only if they protect a compelling state interest and are "narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade, supra* 410 U.S. at 155, 93 S.Ct. at 728. The state, in this case, must demonstrate the existence of an interest equivalent to, or greater than, the right to life to justify the use of deadly force against fleeing felons.[28] No such demonstration has been made here. Rather, the statute creates a conclusive presumption that all fleeing felons pose a danger to the bodily security of the arresting officers and of the general public.[29] The presumption is incorrect in its application to the facts of this case and has not otherwise been shown to be factually based.[30] We find nothing in this record, in the briefs of the parties or of the Attorney General, in scholarly litera-

*v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); the right to compulsory process, *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); the right to confront accusing witnesses, *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**27.** The rationale for the statutes permitting the use of deadly force is now largely discredited, but that alone generates little pressure for statutory change. The following comment made by Professor Tribe in discussing *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), is apropos:

[I]t seems hard to deny that convicted murderers and the ad hoc groups that coalesce around their dramatic but passing causes make a singularly ineffective legislative constituency when compared with the continuing groups—such as policemen's benevolent associations—arrayed on the other side. However widely or intensely humane opinion may condemn the death penalty as cruelly excessive (and however great the percentage of death-scrupled jurors), it remains likely that more votes will be lost than won by the platform of abolition, or even by the platform of reforming the statutory law to allow death-scrupled jurors to sit on capital cases. And insofar as the death penalty is carried out too infrequently or discriminatorily to generate sustained political pressure for its repeal, legislative rigidity will be reinforced . * * *.

Tribe, *Structural Due Process,* 10 Harv.Civ. Rights-Civ.Lib.L.Rev. 269, 318–319 (1975) (footnote omitted).

**28.** See *Storey v. State,* 71 Ala. 329 (1882), and *People v. Ceballos,* 12 Cal.3d 470, 116 Cal.Rptr. 233, 526 P.2d 241 (1974). In *People,* which also involved a burglary, the court stated:

Where the character and manner of the burglary do not reasonably create a fear of great bodily harm, there is no cause for exaction of human life. * * * The character and manner of the burglary could not reasonably create such a fear unless the burglary threatened, or was reasonably believed to threaten, death or serious bodily harm.

*Id.* at 479, 116 Cal.Rptr. at 238, 526 P.2d at 246 (citations omitted).

**29.** Statutes are subject to strict scrutiny when they contain a presumption that impinges upon fundamental rights. *Cleveland Board of Education v. LaFleur, supra*; *United States Dept. of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Vandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Stanley v. Illinois, supra*; *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Skinner v. Oklahoma, supra. See also* Tribe, *supra*; Note, *The Conclusive Presumption Doctrine: Equal Process or Due Protection?,* 72 Mich.L.Rev. 800 (1974); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534 (1974).

**30.** The Public Interest Law Center, of Philadelphia, completed a study of the use of firearms by Philadelphia policemen for the period 1970 through 1974. Among the conclusions that they reached were the following: approximately forty-five percent of the victims shot were unarmed; approximately forty-five percent of

ture, in the reports of distinguished study commissions, or in the experience of the nation's law enforcement agencies, to support the contention of the state that statutes as broad as these deter crime, insure public safety or protect life. Felonies are infinite in their complexity, ranging from the violent to the victimless. The police officer cannot be constitutionally vested with the power and authority to kill any and all escaping felons, including the thief who steals an ear of corn,[31] as well as one who kills and ravishes at will. For the reasons we have outlined, the officer is required to use a reasonable and informed professional judgment, remaining constantly aware that death is the ultimate weapon of last resort, to be employed only in situations presenting the gravest threat to either the officer or the public at large. Thus, we have no alternative but to find V.A.M.S. §§ 559.040 and 544.190 unconstitutional in that they permit police officers to use deadly force to apprehend a fleeing felon who has used no violence in the commission of the felony and who does not threaten the lives of either the arresting officers or others.[32]

█ It is not for this Court to write new statutes for the State of Missouri. We can only say that the statutes would be constitutional if carefully drawn to limit the use of deadly force by law enforcement officers in the apprehension of fleeing felons to situations where the officer has a warrant or probable cause to arrest the felon where the felon could not be otherwise apprehended and where the felon had used deadly force in the commission of the felony, or the officer reasonably believed the felon would use deadly force against the officer or others if not immediately apprehended.

the victims were shot while fleeing from the police; in approximately one of four incidents, an unarmed victim was shot while fleeing; approximately fourteen percent of the victims shot were juveniles; and the police department consistently failed to discipline policemen who misused their firearms.

A study conducted by the Planning and Research Division of the Boston Police Department reveals police officers discharged their firearms in 210 cases between 1970 and 1973, 102 of the shots were in response to a fleeing suspect. In none of the 102 instances was there an assault on a police officer. In 80 of the cases, the fleeing suspect was unarmed.

**31.** *Storey v. State, supra* 71 Ala. at 341.

**32.** We are also urged to invalidate the Missouri statutes on Fourteenth Amendment equal protection grounds and on the basis of the Eighth Amendment prohibition against cruel and unusual punishment.

The equal protection argument is that the state statutes permit deadly force to be used against all felons and denies its use as to misdemeanants. While this argument is not without merit, it seems to us that it misses the essential point.

The real objection to the use of deadly force against non-violent felony suspects is not that such laws discriminate between non-violent felony suspects and misdemeanants, but that non-violent suspects are shot at all.

Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev., *supra* at 379 (footnote omitted).

An additional equal protection challenge can be made upon the basis of the disproportionate use of deadly force against non-white suspects. *See* note 15, *supra* at 1014.

In view of the mandate to judges to consider the proportionality and moral adequacies prescribed for criminal conduct, a good argument can be made for a decision on the basis of the Eighth Amendment. *But see Cunningham v. Ellington, supra*; *Wiley v. Memphis Police Dep't, supra*; and the court below, which all have held that an officer's use of deadly force to arrest is not punishment within the meaning of the Eighth Amendment as the arresting officer has no power to punish and may be violating the law if he seeks to do so. For detailed discussion of this problem, *see* Comment, 11 Harv.Civ.Rights-Civ.Lib.L.Rev., *supra* at 381–383.

It has also been suggested that statutes of this type can be held violative of the Fourth Amendment. We do not consider that approach, however, as it was not considered below and was not advanced on appeal. *See United States v. Birgnoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Comment, 11 Harv.Civ.Rights-Civ.Lib. L.Rev., *supra* at 384–385.

GIBSON, Chief Judge, dissenting, joined by STEPHENSON and HENLEY, Circuit Judges.

The majority opinion recognizes that the Missouri statutes at issue here are merely a codification of the common law dating from Fifteenth Century England [1] and that at least 24 states have similar codifications of the common law currently in force. After devoting two-thirds of its opinion to an analysis of the wisdom of the Missouri statutes, the majority disclaims authority to address that subject and declares the statutes unconstitutional. Thus, after a background of five centuries of the common law and two centuries of this country's existence, lo and behold the majority, *ipse dixit,* has held that the common law principles embodied in these Missouri statutes are violative of the Due Process Clause of our Constitution. While acknowledging that other courts have reached a contrary decision,[2] the majority shows no interest in the direction taken by other judicial authorities and turns elsewhere for guidance.

> [They] find nothing in this record, in the briefs of the parties or of the Attorney General, in scholarly literature, in the reports of distinguished study commissions, or in the experience of the nation's law enforcement agencies, to support the contention of the state that statutes as broad as these deter crime, insure public safety or protect life.

The majority then refers to an "infinite" range of felonies and felons and concludes that it has "no alternative but to find V.A.M.S. §§ 559.040 and 544.190 unconstitutional * * *."

The majority's decision fails to recognize that Mo.Rev.Stat. § 544.190 (1969) only permits such force as may be reasonably necessary to apprehend a fleeing felon. The statute requires (1) that the arresting officer give a suspect notice of his intention to arrest, (2) that the suspect must either flee or forcibly resist, and (3) that whatever force the officer uses must be necessary. Furthermore, the officer must have probable cause to believe that the suspect has committed a crime. Thus, any unreasonable and unnecessary application of force would be arbitrary and an abuse of authority entailing proper sanctions against the officer.

Of course, the fact that a common law principle is of ancient origin and has withstood centuries of acceptance and has become embedded in a state statutory scheme does not isolate it from criticism or make it immune to change. But the modification of state statutes involving questions of public policy is primarily within the province of the legislative branch and under our constitutional scheme of separation of powers judicial intervention in the process should be severely limited. Indeed, prior to this decision, no court has held that the modification of a statute of this sort falls within the judicial purview delimited by the separation of powers contained in our Constitution.

As noted by the District Court, under our Constitution, questions of public policy have been placed specifically within the province of the legislative branch and not within that of the judicial branch, whose function is basically one of interpretation. The debate and writings alluded to in the majority opinion deal with and relate to suggested legislative changes in the common law provisions permitting the use of all reasonable and necessary force to effect the apprehension of a fleeing felon, such as those proposed in the Model Penal Code. I feel that the question of the dimensions of the Missouri statutes on the use of force to effect

---

1. The forerunner of the current Missouri statutes was Mo.Rev.Stat. art. 2, ch. 24, § 1235 (1885), which recognized homicide as justifiable, *inter alia,* "when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed

* * *." This statute has been interpreted by the Missouri state courts as declaratory of the common law. *State v. Dierberger,* 96 Mo. 666, 10 S.W. 168 (1888).

2. See *ante* p. 1017, n.21.

arrests is one that is clearly appropriate for the Missouri legislature and inappropriate for the federal courts. Indeed, as noted by the majority, 15 states have chosen to make legislative modifications of statutes on this issue. This is fully in keeping with our traditions, practices and principles of representative government. On the other hand, the majority does not cite, nor can I find, any state where the common law rule on the use of deadly force, either codified or uncodified, has been invalidated by either a state or federal court. Those courts faced with attacks on the common law rule allowing all force reasonably necessary to effect the arrest of fleeing or resisting felons have consistently held that these attacks present policy questions for the legislature, not the judiciary. *Jones v. Marshall,* 528 F.2d 132 (2d Cir. 1975); *Cunningham v. Ellington,* 323 F.Supp. 1072 (W.D.Tenn.1971) (three-judge court); *Hilton v. State,* 348 A.2d 242 (Me.1975); *Shumann v. McGinn,* 240 N.W.2d 525 (Minn.1976).

As indicated, I find no justification for the majority's deviation from the approach taken by all other courts faced with this issue. Judicial self-restraint may not be relaxed by the simple expedient of labelling clear questions of public policy as questions of constitutional law. Most issues of public policy have constitutional implications, but they are not thereby automatically removed from the legislative province and placed in the hands of the courts.

An examination of the history of the American Law Institute's experience in attempting to modify the common law rule on the use of deadly force to effect arrest also supports the conclusion that the issue at stake in the present case is one of public policy appropriate for the legislature, not the judiciary. In 1934 the ALI, in its First Restatement of Torts, modified the common law principle permitting the use of deadly force to effect the arrest of a felon. *Restatement (First) of Torts* § 131 (1934). This modification was abandoned in 1948,

however, and the common law rule was readopted. The 1966 Appendix to the Second Restatement of Torts justifies this abandonment on the grounds that the modification contained in § 131 had, from its inception, lacked any support other than dicta and argument by analogy. Moreover, in 1966, no case could be found which had cited § 131 or had been in accord with it.

Significantly, however, the ALI's abandonment of proposed modifications of the common law rule on the use of deadly force was limited to the Restatement. In drafting the Model Penal Code, the ALI did not hesitate to propose that the common law rule be legislatively modified. According to the majority opinion, *ante* pp. 1012–1013 & n.11, at least seven states have now chosen to legislatively adopt Model Penal Code § 3.07 on the use of deadly force in effecting an arrest. It is ironic that the majority, which cites the Model Penal Code extensively and clearly relies on Model Penal Code § 3.07 in suggesting what sort of statute it would consider proper, ignores the fact that the ALI drafted the Model Penal Code as a proposal of legislative, not judicial, modification of the common law. The majority would now judicially legislate it.

In the present case, the need for judicial restraint is particularly compelling in light of recent consideration of the problem by the Missouri legislature. In 1975 the Missouri legislature had before it a bill providing modifications of the common law based upon the Model Penal Code. The very fact that the Missouri legislature has so recently considered amending the statute now struck down by the majority indicates that Missouri is not oblivious to this area of public policy, which is in fact a sensitive one.

Indeed, the sensitivity of this issue is easily blurred by a single-minded focus on the seemingly absolute right of an individual to life. An individual's right to life is,

however, beset with many obstacles, limitations and contradictions. Life is not permanent; it is subject to obliteration by accidents, inadvertence and by the hazards of everyday living. There is no constitutional right to commit felonious offenses and to escape the consequences of those offenses. There is no constitutional right to flee from officers lawfully exercising their authority in apprehending fleeing felons.

To measure the constitutionality of the Missouri statutes here, the individual's right must be weighed against the interests of the state. Rather than identifying the state interests involved here, however, the majority simply concludes that the state has failed to show an interest equivalent to the right to life. Thus, the majority balances a specific individual right to life against amorphous, unidentified state interests and, not surprisingly, finds the right to life to be weightier. I believe that the state's interests must be identified before a proper constitutional balancing can be made. These interests include effective law enforcement, the apprehension of criminals, the prevention of crime and the protection of members of the general populace, who, like fleeing felons, also possess a right to life.

Furthermore, I consider the majority's proposed modification of the common law rule a remarkably impractical means of balancing the interests and rights at stake. The majority states at page 1020, *ante,* that:

> [S]tatutes would be constitutional if carefully drawn to limit the use of deadly force by law enforcement officers in the apprehension of fleeing felons to situations where the officer has a warrant or probable cause to arrest the felon where the felon could not be otherwise apprehended and where the felon had used deadly force in the commission of the felony, or the officer reasonably believed the felon would use deadly force against

the officer or others if not immediately apprehended.

This standard presupposes that law enforcement officers are endowed not only with foresight, but also with that most characteristic judicial vision, hindsight. The majority does not suggest how law enforcement officers are to make the on-the-spot constitutional analysis called for by its proposal and still react quickly enough to meet the exigencies of an emergency situation. How can a police officer ever know, reasonably or otherwise, whether the felon will use force against others if not immediately apprehended? It is clearly the prerogative of the state legislature to decide whether such restrictions on the use of force are consonant with public policy.

Ultimately it seems that we have at conflict the interest of the state in effectively bringing felony suspects to answer charges against them and the interest of the felony suspect in being brought to submission, if at all, with the greatest degree of protection of his safety. I think it is not our duty, upon the legislative facts before us, to balance those conflicting interests and if it is, I cannot agree that on balance the choice made by the legislature of Missouri is an impermissible one. The state is not required to adopt a policy which might encourage the fleet of foot and the foolhardy felon or to reject a policy of apprehending suspects by use of all reasonable force.

For the foregoing reasons I am unable to join in the majority opinion.