Willie SPEARS, Plaintiff,

v.

James CONLISK, Superintendent of Chicago Police Department, City of Chicago, a Municipal Corporation, Edward Castellano, Joseph C. Benigno, Thomas Granias, Kenneth Pardell, Theodore Jensen, Frank Musial, Frank Maher, James Sesso, and Donald Melchiori, Defendants.

No. 73 C 277.

United States District Court,
N. D. Illinois, E. D.

Nov. 3, 1977.

Richard A. Halprin, Ronald J. Clark, Clark, Howard, Thomas & Piers, Chicago, Ill., for plaintiff.

Edward A. Gausselin, Asst. Corp. Counsel, William R. Quinlan, Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This is an action by plaintiff Willie Spears, a four-time convicted felon, against James Conlisk, the former Superintendent of the Chicago Police Department, the City of Chicago, a municipal corporation, and nine Chicago Police Officers, Edward Castellano, Joseph C. Benigno, Thomas Granias, Kenneth Pardell, Theodore Jensen, Frank Musial, Frank Maher, James Sesso and Donald Melchiori, brought under Section 1 of the Fourteenth Amendment to the Constitution of the United States, and §§ 1983 and 1988 of Title 42 United States Code, with jurisdiction under §§ 1331 and 1343(3) of Title 28 of the United States Code, alleging that defendants individually and collectively deprived plaintiff of rights guaranteed him by the Fourteenth Amendment. The case was tried to the court without a jury. Prior to trial, defendants Conlisk and the City of Chicago were dismissed by Judge Parsons of this court upon the ground that they were not amenable to suit under Section 1983. *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Since that dismissal, the Court of Appeals for this circuit has also held that the City in the circumstances of this case is not amenable to suit directly under the Fourteenth Amendment. *McDonald v. State of Illinois*, 557 F.2d 596 (7th Cir. 1977). At the close of plaintiff's case, plaintiff conceded that no evidence had been adduced implicating defendants Granias, Benigno and Jensen in the alleged wrongs of which plaintiff complains. Accordingly, they were dismissed as defendants at that time. Thus, what remains is plaintiff's complaint against Castellano, Pardell, Musial, Maher, Sesso and Melchiori. This memorandum will stand as our findings of fact and conclusions of law under Rule 52(a), *Fed.R.Civ.P.*

The complaint is in one count. It alleges that on January 31, 1972, Castellano unlawfully arrested and shot plaintiff and thereafter falsely accused plaintiff of battery of a police officer and resisting arrest. The complaint proceeds to allege that following the incident between Castellano and plaintiff, Castellano, Pardell, Musial, Maher, Sesso and Melchiori, acting in concert, falsely stated that they had found a gun in a squadrol in which plaintiff was transported, and falsely stated that plaintiff admitted the gun was his when confronted with it. Plaintiff claims that as a consequence of defendants' individual and collective misconduct, he was falsely charged in the Illinois State courts with unlawful use of a weapon (knowingly carrying a concealed weapon), battery and resisting arrest, and that each of the defendants testified falsely against plaintiff as to those charges at a preliminary hearing, before the Illinois Grand Jury, and at his separate trials on the unlawful use of weapon, battery and resisting arrest charges. It is undisputed that plaintiff was charged as he alleges, was twice tried in bench trials in the Illinois State courts (once on the charge of unlawful use of weapon, and later on the charges of battery and resisting arrest), and was acquitted in those bench trials of all of the charges. This action followed.

At about midnight of January 30–31, 1972, Officers Castellano and Benigno were on patrol duty in their squad car on the far

west side of the city. Shortly after midnight they received a radio assignment of a burglary in progress at 333 North Central Avenue. They proceeded to that location and entered a four-story double-winged multi-apartment building. There were two staircases. Castellano went up the staircase serving the north wing; Benigno took the south wing.

Castellano went up to the first floor, checked the long corridor which runs east and west, saw no evidence of burglary or forced entry, returned to the stairwell and proceeded to the second floor. Here he encountered plaintiff who had stopped in the building to visit a friend.

As Castellano stepped out of the stairwell into the east-west corridor, he saw plaintiff about 20 feet down the corridor to the west walking in an easterly direction toward Castellano. Castellano was in uniform and in all of the circumstances, he understandably had his gun in his hand. He told plaintiff to halt. Plaintiff did not heed the command. Instead, he continued toward Castellano with his hands in the side pockets of a pea coat he was wearing.

According to plaintiff, Castellano asked what plaintiff was doing in the building. According to Castellano, plaintiff responded "I'm no burglar." Both agree that plaintiff kept walking toward Castellano and that Castellano again ordered him to halt and take his hands out of his pockets. Plaintiff kept walking. Castellano repeated the command, but plaintiff continued his approach to within three or four feet of Castellano. At this point, there is an irreconcilable conflict in the testimony.

Castellano testified that plaintiff stopped and took his left hand out of the pea coat pocket, but not his right. Castellano reached forward to pat down plaintiff's right outer garment. His gun was belt high, pointing at plaintiff's stomach and was not cocked. As Castellano reached forward with his left hand to pat plaintiff, plaintiff grabbed Castellano's right wrist and pulled Castellano forward. Castellano's gun discharged and plaintiff was shot in the left side of the neck, the bullet

entering the front (anterior) of the neck and exiting the rear (posterior).

Plaintiff's version was markedly different. He testified that when he got within four feet of Castellano, he was ordered to take his hands out of his pockets and get up against the wall. Castellano had a gun in his right hand pointed at plaintiff's midsection. Plaintiff turned and faced the wall and placed his hands on the wall over his head. Castellano was behind him. Castellano started to pat plaintiff down using his left hand. He went into plaintiff's left hip pocket and plaintiff turned to him and said that he was trying to take plaintiff's wallet. Plaintiff grabbed Castellano's left hand. Castellano then put his gun on the back (posterior) of the left side of plaintiff's neck and told him to get back up against the wall. Plaintiff tried to shift from under the pressure of the gun muzzle. The gun discharged and plaintiff was shot through the left side of the neck with the bullet entering the rear (posterior) and exiting the front (anterior).

According to Castellano, after the shot was fired, both he and plaintiff froze for a second or two. Castellano saw a red circle on the left side of plaintiff's neck. Plaintiff then slumped toward the wall. Castellano holstered his gun and grabbed plaintiff by the arms. At that point he was joined by Officer Granias who took plaintiff downstairs to a squadrol. The next time Castellano saw plaintiff was at the 15th District police station which, as we shall see, was after plaintiff had been taken to a hospital.

Plaintiff's version of the immediate postshooting activity is different. He testified that after he was shot he fell. That Castellano then went through his pockets. Then Castellano called on his hand radio for a wagon. Two more uniformed police came to the second floor corridor. They took him downstairs and put him in a squadrol. They searched him on the way.

Plaintiff's account is corroborated by the testimony of Officers Granias and Benigno that they went to the second floor and took plaintiff downstairs. Granias testified, however, that as he tried to search plaintiff

on the way down, plaintiff fell into Granias' arms and Granias was not able to pat down plaintiff's pockets.

Officer Pardell was a squadrol operator on duty with his partner Officer Jensen in the same west side area. About midnight they received a radio call for a burglary in progress at 333 North Central Avenue. According to Pardell, when they arrived they observed a squad car on the west side of Central Avenue and some officers interviewing some youths in an alley. On the east side of Central Avenue, there were two squad cars but they observed no officers.

Shortly after their arrival, Pardell observed Officer Granias with plaintiff in his custody. Pardell asked Granias what the situation was and Granias replied that Castellano had shot plaintiff. Pardell began to search plaintiff. He ran his hands down from under plaintiff's arms to his ankles. Plaintiff had his left hand to his neck. Pardell saw blood. Plaintiff said, "It hurts, man, it hurts." Pardell said, "Let's get him to the hospital." Plaintiff was put in the prisoner's section of the squadrol on a stretcher and taken to Loretto Hospital.

When they arrived, Pardell walked plaintiff into the hospital and delivered him to a nurse. He kept plaintiff under constant observation until other officers arrived and relieved him.

Pardell testified that he immediately returned to his squadrol and searched the prisoner's compartment. Under the stretcher he found a .22 caliber Rohn revolver. Plaintiff had been the first prisoner in the squadrol during Pardell's shift and prior to checking out the squadrol that night, Pardell had searched the compartment and found nothing. He picked up the gun by the checkered grip and took it inside where he saw Officer Maher. He motioned to Maher and gave him the gun.

Officer Maher testified that he was on duty the night in question in the same west side area. He was called to 333 North Central Avenue and then to the emergency room at Loretto Hospital. When he arrived at the hospital he saw plaintiff seated in the emergency room with a gauze bandage around his neck. Officers Sesso, Melchiori and Musial were also there and Sesso was questioning plaintiff.

Maher testified that Pardell came to the emergency room and motioned for Maher to step outside. When he did so, Pardell handed him a .22 caliber Rohn revolver and told Maher that he had found it in the wagon. Maher took the gun from Pardell and went back to the emergency room holding the gun by the grip to preserve fingerprints. As Maher held the gun by the grip, Sesso asked plaintiff if the gun was his. Plaintiff reached out, nodded affirmatively and said "Yes." At that time, Maher, Sesso, Melchiori and Musial were present.

Plaintiff denied that he had admitted that the gun was his.

Maher testified that he took the gun to the 15th District police station. On his way he asked by radio for a crime lab person to meet him there. Upon arrival, he turned the gun over to the crime lab person to check for fingerprints. The crime lab person was dusting the gun when Maher heard something fall to the floor. He turned and the technician was picking up the bullets off the floor without taking any precautionary measures to preserve the integrity of any fingerprints.

Officers Musial, Sesso and Melchiori all testified that they arrived at the emergency room at Loretto Hospital while plaintiff was there. Each testified that when Maher came in with the gun, Sesso, who was questioning plaintiff, asked plaintiff if the gun was his and that plaintiff nodded and said "Yes". Musial also testified that when he first arrived at Loretto, plaintiff was seated on the table yelling, "If I had my piece, things would be different."

While he was at Loretto Hospital, plaintiff was taken to the x-ray department by Officer Benigno. According to Benigno on the way to x-ray plaintiff asked Benigno if the bullet had come out and as he asked, plaintiff exposed the rear of his neck. Benigno also testified that on the elevator plaintiff's bandage fell off and Benigno saw what he identified as powder burns around the wound in front.

Plaintiff was treated at Loretto by Dr. Edward Smith. Smith first recorded on the emergency room record that plaintiff had suffered a gun shot wound at the left side of the neck with entry at the left posterior (back) and exit at the left anterior (front) below the angle of the jaw.[1] Smith then changed the entry to read that the exit was in the left posterior and the entry in the left anterior. Under physical findings he noted a painful neck with spasms and good carotid pulses. The throat was OK, the ears were OK and the neck showed powder (?) burns at the anterior (front) triangle of the neck.[2] When asked to explain his change between exit and entry, Smith responded by a letter to plaintiff's counsel in April, 1972 which was received in evidence without objection:

"I think I remember changing the words 'exit' and 'entry' because of what I noted in 'physical findings' i. e., where it says: 'neck powder (?) burns antr △ (anterior triangle) L neck.' There were punctate discolorations at that area which neither looked like typical burns *nor* like a bruise that one sees at exit wounds sometimes. I gather that the emergency room at Cermak Hospital detected changes in his condition regarding the skin wounds which may have caused them to regard the situation as the reverse of my interpretation."

After receiving treatment at Loretto, plaintiff was taken to the 15th District police station where he was charged with unlawful use of a weapon, battery and resisting arrest. While he was there, plaintiff was interviewed by Gino Divito, an Assistant State's Attorney. Plaintiff gave an oral statement to Divito in which he gave an account of the shooting generally consistent with his testimony in his subsequent state court trials and the testimony he has given here. When Mr. Divito sought to take a written statement from plaintiff, plaintiff declined.

Divito was advised that a gun had allegedly been found in the squadrol at Loretto Hospital. But none of the officers involved in the incident told Divito of plaintiff's alleged admission.

Divito prepared a written report of his investigation which was received in evidence without objection. The report states, inter alia:

"I [Divito] asked him [plaintiff] whether he carried any weapon at all, specifically whether he carried a .22 caliber gun. He denied doing so. In interrogating him at one time, he denied without any prompting on my part, he denied striking the police officer, but said he could have shot him. When I asked him what he meant by that, that he had a gun or what. He denied that he had a gun, he stated that it would be foolish for him to strike a police officer with a gun." Plaintiff's Exhibit 3, p. 3.

The reports of the various officers which were prepared several hours subsequent to the events do include plaintiff's alleged admission of the possession of the gun.

As a result of the State charges made against him, plaintiff was taken from the 15th District station to the Cook County Jail where he remained in custody, because of his inability to post bond, until he was acquitted of all of the charges made against him. Following his arrival at the Cook County Jail, he was treated at the Cermak Memorial Hospital which is an adjunct of the jail. The physical examination report of the hospital which was received in evidence without objection, describes the gun shot wound as follows:

"There is wound of entrance in the mid-cervical spine about 2 cm. lateral to the midline and there is a wound of exit, with some contusion around the wound of exit in the anterior lateral aspects of the neck, in the middle portion of the sterno-cleidomastoid muscle. The carotid arteries are palpable. However, the patient

---

1. The actual entry reads, "GSW (L) SIDE OF NECK Entry L Postr neck. Exit L antr neck below angle of jaw."

2. The actual entry reads, "Painful neck s̄ spasms good carotid pulses. Throat OK Ears OK Neck s̄ powder (?) burns antr △ L neck."

has marked enduration and edoema at the region of the exit of the bullet wound." Plaintiff's Exhibit 1, fifth page. In the history portion of the hospital report, the following appears:

"This is the case of a 36 year old male patient who was admitted to the hospital with a history of gunshot wound over the left side of his neck, three days prior to admission. The patient states that he was shot from behind and there are two wounds in his neck, one at the back, just lateral to the midline of the left side and the wound of exit of the bullet is in the front of the neck, anterior lateral aspect of the neck." Id., sixth page.

In June, 1972 in preparation for the defense of the criminal charges made against him, plaintiff was examined by Dr. Levine, a forensic pathologist practicing in Chicago. Levine examined the scars on plaintiff's neck. He observed that the bullet had travelled in a lateral straight line. He testified in this trial that entrance bullet wounds are usually round or oval, while exist wounds are irregular, star-shaped or triangular with splits. When the bullet enters it pushes the skin inward; when it exits, it pushes the skin out and tears the skin. Levine testified that he was able to ascertain which was the entrance wound and which was the exit wound from an examination of the scars. He testified that the scar on the back of the neck was almost round or oval and that the scar on the front of the neck was larger and irregular. During the course of the trial and while Levine was testifying, we examined the scars on plaintiff's neck and observed that they meet the physical description which Levine gave them. Levine then expressed the opinion that the scar on the back of the neck was a typical entrance scar and the scar on the front of the neck was a typical · exit scar.

Dr. Shelby Nasatir, a staff radiologist at Loretto Hospital, testified for the defendants. He had not treated plaintiff. On the basis of x-rays of plaintiff's neck, Dr. Nasatir testified that he could not form an opinion regarding the entry/exit wounds but the wound travelled in a lateral direction with a slight angle.

At a preliminary hearing held on March 14, 1972, on the unlawful use of weapon charge, Castellano, Pardell and Sesso testified essentially in accord with the testimony they have given here. Probable cause was found and plaintiff was bound over to the grand jury.

On April 25, 1972, Castellano, Pardell and Melchiori testified before the grand jury essentially in accord with their testimony here. An indictment was returned charging plaintiff with knowingly carrying a concealed weapon on his person.

On August 21, 1972, plaintiff was tried in a bench trial in the Circuit Court of Cook County on the unlawful use of weapon charge. Castellano, Benigno, Granias, Pardell, Jensen, Musial and Maher testified against him essentially as they have here. Plaintiff was found not guilty by Judge Robert J. Downing.

Thereafter, plaintiff was tried in a bench trial by a different judge and found not guilty of the charges of battery and resisting arrest.

We turn now to a resolution of the issues of fact in this case. There are two of them. Under what circumstances and how was plaintiff shot by Castellano in the hallway of 333 North Central Avenue? As plaintiff has testified, from the back as he stood against the wall? Or as Castellano has testified, from the front as plaintiff struck and resisted Castellano?

The second issue concerns the gun. Did Officer Pardell find it in the squadrol as he has testified, or was it planted there as plaintiff alleges? And did plaintiff admit having the gun as Officers Maher, Musial, Sesso and Melchiori have testified? Or did plaintiff deny ownership of the gun as he has testified?

These same issues were presented to two state judges in the criminal charges brought against plaintiff.[3] In those cases

3. Although the unlawful use of weapon charge did not directly involve the plaintiff's encounter with Castellano, Judge Downing heard testimony concerning it. At the conclusion of the trial

the issues were resolved in favor of plaintiff and against the prosecution. There the burden was upon the State to prove plaintiff's guilt beyond a reasonable doubt and it failed to do so. Here the burden is upon the plaintiff to persuade us by a preponderance of the evidence that the facts are as he alleges them to be.

■ Despite the defendants' insistence that plaintiff, "a four time loser" (Br. 6), should not be believed we are persuaded that the shooting incident occurred as plaintiff has testified. All of the objective evidence points to that conclusion.

First is the undisputed fact that the wound travelled laterally through plaintiff's neck at virtually no angle.[4] Dr. Levine so testified and we observed the scars in plaintiff's neck during the trial. An imaginary line drawn between the two scars would be almost horizontal and parallel with the floor upon which Castellano and plaintiff were standing. Yet during his testimony at this trial, Castellano demonstrated what he said was his position in relation to plaintiff and the movement that occurred between himself and plaintiff as the shot was fired. He showed that he had his gun at his waist, extended forward somewhat, and claimed that plaintiff grabbed Castellano's gun hand with plaintiff's left hand, causing the gun to discharge. If this were the fact, the trajectory of the bullet as it passed through plaintiff's neck would have been at an upward angle from the front. But it was not, and there was no evidence that the bullet struck something in plaintiff's neck, e. g., a bone or cartilage, and deflected down.

Then there is the unequivocal expert testimony of Dr. Levine that the scar on the back of plaintiff's neck evidenced the entry wound and the scar on the front the exit wound.

Next, there is the hospital report of Cermak Memorial Hospital. The records of the hospital show that plaintiff was admitted February 3, 1972 (3 days after the shooting) and discharged on February 9. The report of physical examination bears a somewhat illegible date in the upper right hand corner which appears to be "2–3–72." In the lower left hand corner, there are dictation symbols which read "Dr. M. Arain:A–1" and beneath that "D. 2/4/72" and beneath that "T. 2/4/72" which we interpret to mean that the report was dictated on February 4 and transcribed the same day. The report of physical examination states, "There is a wound of entrance in the mid-cervical spine about 2/ cm. lateral to the midline and there is a wound of exit, with some contusion around the wound of exit in the anterior [front] lateral aspect of the neck, . ."

Next there is the report of Dr. Smith at Loretto Hospital emergency room which when originally written characterized the entry wound as the left posterior and the exit wound as the left anterior. Smith did not testify, but his letter explains that he changed the words "exit" and "entry" because of his notation in "physical findings" "Neck: powder (?) burns antr △ (anterior triangle) L neck." We are unimpressed with the explanation.

Defendants rely heavily on the alleged powder burns in the anterior (front) of plaintiff's neck. Officer Benigno testified that he saw powder burns on plaintiff's neck at Loretto Hospital when he was taking plaintiff to x-ray and plaintiff's dressing fortuitously fell off.

To corroborate Benigno, defendants called Ernest Warner, a firearms examiner for the Chicago Police Department. He testified that in September, 1974, twenty-one months after the incident in question, he conducted some tests with a .357 revolv-

---

in rendering an oral opinion in which he found plaintiff not guilty Judge Downing said "The Court finds it very difficult [in light of all the evidence] to attach much credibility to the testimony of Officer Castellano."

4. Defendants' witness, Dr. Nasatir, did not contradict this finding although he testified that he observed a slight angle in the lateral direction of the wound.

er and some homemade ammunition submitted to him by Castellano. He ran powder pattern tests from 3 inches to 24 inches in increments of 3 inches from white paper targets using factory ammunition and homemade ammunition. We saw the patterns and there were marked differences between those created by the factory ammunition and the homemade ammunition with the homemade creating the larger pattern. However, neither created a significant pattern at 24 inches which, according to Castellano's testimony and his demonstration, would have been the least distance between the discharged weapon and the front of plaintiff's neck. Furthermore, there was no testimony that the revolver which Warner tested was the revolver Castellano used on the night in question, and if it was, whether it was in the same condition when tested as when fired, and there was no testimony regarding the type of ammunition which Castellano used, i. e., homemade or factory. Consequently, the tests were of no probative value.

On the basis of the trajectory of the bullet, Dr. Levine's testimony and the results of the physical examination at Cermak Memorial Hospital, we credit plaintiff's testimony that he was shot in the back of the neck as he stood facing the wall in the hallway at 333 North Central Avenue.

In the circumstances which confronted Castellano that night, he was justified in having his weapon ready for use. His command to plaintiff to halt and get up against the wall so that he could pat plaintiff down was reasonable. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). But there was no occasion for him to discharge his weapon. And under no circumstances was he justified in falsely accusing plaintiff of resisting arrest and battery and testifying falsely at the preliminary hearing, grand jury, two criminal trials and the trial here that he had shot plaintiff from the front when plaintiff grabbed for Castellano's gun.

The gun incident has its beginning point immediately after plaintiff was shot. Plaintiff, who we have found to be credible with respect to the shooting incident, testified that when he fell to the floor, Castellano went through his pockets. Benigno and Granias came to the second floor corridor following the gunshot and took plaintiff down the stairs to the squadrol. On the way down, Granias attempted to pat down plaintiff. When plaintiff arrived at the squadrol, Pardell ran his hands down from under plaintiff's arms to his ankles before placing him on the stretcher in the squadrol. In short, plaintiff was searched before he was placed in the squadrol and no gun was found on his person.

Pardell testified that after plaintiff was taken to the emergency room at Loretto Hospital, he (Pardell) searched the prisoners' section of the squadrol and found a .22 caliber Rohn revolver underneath the stretcher. Pardell claims to have delivered the gun to Maher who in turn displayed it to plaintiff while Officer Sesso asked if it was plaintiff's gun. According to Maher, Musial, Sesso and Melchiori, plaintiff admitted it was his gun.

Plaintiff denies that he admitted the gun was his. He also denies that he ever had the gun. While presumably in the custody of the Chicago Police Department, the gun was not produced at this trial nor was any explanation offered for defendants' failure to do so.

Plaintiff testified in this trial that during the concealed weapon trial when the gun was available, he demonstrated that the gun could not have been concealed in the pocket of his pea coat. The transcript of that trial which was received in evidence here without objection corroborates him.

Then there is the remarkable incident regarding the crime lab person who was dusting the bullets in the gun for fingerprints at the 15th District station. According to Maher the crime lab person dropped the gun and bullets, but picked up the bullets without taking any precautionary measures to preserve the integrity of any fingerprints which might have been on them.

Finally, there is Assistant State's Attorney Divito's testimony that when he con-

ducted his investigation and interrogation in the early morning hours of January 31 at the 15th District station, no one advised him that Spears had admitted owning the gun.

■ The credible testimony and circumstances leave us with an abiding conviction that the gun was not found in the squadrol and Pardell's testimony that it was is false. Plaintiff did not admit ownership of the gun and the testimony of Maher, Musial, Sesso and Melchiori that he did is false. In short, Pardell, Maher, Musial, Sesso and Melchiori falsely accused plaintiff of possession of a concealed gun.

■ There is no question that the conduct of which plaintiff complains was performed by all of the defendants under color of state law. 42 U.S.C. § 1983; *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Nor can there be any question that their conduct was actionable under § 1983. Castellano violated plaintiff's Fourth, Eighth and Fourteenth Amendment rights when he intentionally or recklessly shot plaintiff. *Monroe v. Pape, supra; Davis et al. v. Murphy et al.*, 559 F.2d 1098 (7th Cir. 1977); *Clark v. Ziedonis*, 368 F.Supp. 544 (E.D.Wis.1973). Castellano also violated plaintiff's Fourteenth Amendment rights when he falsely accused plaintiff of battery and resisting arrest and testified falsely against plaintiff in respect to those charges in the several state court proceedings. *Davis et al. v. Murphy et al., supra.* So, too, did Pardell, Maher, Musial, Sesso and Melchiori violate plaintiff's Fourteenth Amendment rights by their false accusations and testimony regarding the concealed gun. *Davis et al. v. Murphy et al., supra.* All of the defendants acted wilfully and maliciously. *Bonner v. Coughlin*, 545 F.2d 565 (7th Cir. 1976). Accordingly plaintiff is entitled to recover damages from all of the defendants who remain in the case.

■ As a consequence of Castellano's unlawful use of excessive force, plaintiff suffered a grievous wound and its attendant pain and suffering which, he testified, persisted for almost a year.[5] But Pardell, Maher, Musial, Sesso and Melchiori are not accountable for that injury.

■ As a consequence of the false charges and testimony made and given against him by all of the remaining defendants, plaintiff was incarcerated for more than eight months awaiting trial; he was unable to post bond. As a result of his confinement, he lost his job at Sears. He also incurred the expenses of attorney's fees.

The false accusations and testimony of Castellano was done by him individually; the false accusations and testimony of Pardell, Maher, Musial, Sesso and Melchiori were done by them jointly.

Plaintiff's complaint prays damages in the amount of $1,000,000. In his closing argument and post trial brief plaintiff did not request damages in any particular amount leaving any award to our discretion. Because we see all of Castellano's conduct to be separate and distinct from that of Pardell, Maher, Musial, Sesso and Melchiori we have concluded that separate, cumulative judgments are appropriate. After careful consideration of all of the evidence we award plaintiff $100,000 in damages from defendant Edward Castellano plus $100,000 in damages from defendants Kenneth Pardell, Frank Musial, Frank Maher, James Sesso and Donald Melchiori jointly and severally. Plaintiff will have judgment in those amounts together with his costs.

---

5. Fortunately plaintiff suffered no permanent injury other than the entry/exit scars.