**Tyrone GUYTON, etc., Plaintiff,**

v.

**Dale PHILLIPS, et al., Defendants.**

**No. C–74–0357 MHP.**

United States District Court,
N. D. California.

Dec. 18, 1981.

---

**1156**

Lew Warden, San Leandro, Cal., Richard J. Simons, Furtado, Jaspovice & Simons, Hayward, Cal., for plaintiff.

Patrick J. Becherer, Crosby, Heafey, Roach & May, Oakland, Cal., Peter Langley, James A. Pezzaglia, Gordon, Waltz & Defraga, Martinez, Cal., for defendants.

OPINION

PATEL, District Judge.

This action is brought on behalf of the deceased minor by his mother as the Administratrix of the Estate. Tyrone Guyton was a black male who, at the time of his death, was fourteen years of age, five feet seven inches tall, and weighed 125 pounds. His death was caused by gunshot wounds inflicted by two officers of the Emeryville Police Department. The shooting occurred at approximately 10:30 p. m. on November 1, 1973. Guyton died at approximately 10:40 that same evening. Although the interval between the shooting and death was brief and the events leading up to it occurred over a short period of time, they are complicated and the subject of sharply conflicting testimony.

Tyrone Guyton was first observed on the evening of November 1, 1973 by Officers Dale Phillips and Thomas Mierkey. He and another black male were standing near a parked vehicle in an area referred to by the police as a high-crime area. In certain locations within that area police made frequent arrests for narcotics, firearms, and other offenses. The area is also a low-income residential area. Officers Phillips and Mierkey were in plain clothes patrolling in an unmarked vehicle. At approximately 10:00 or 10:15 p. m. they observed two black males they could not identify standing near a parked car. As the officers approached,

they heard a "metallic sound" as if, in the words of Officer Mierkey, "a tire iron" hit the ground. Neither officer saw the object, nor did they see the suspects actually in contact with the vehicle. It should be noted that in the statements made by these officers immediately after the incident, neither mentioned hearing a metallic sound. In their testimony at trial both officers referred to such a sound and described it similarly. During their first observation of the two males, neither officer saw them in possession of any firearms or weapons.

The officers concluded that the suspects were "either dirty or going to rip the car off." They based that conclusion on the observation just recounted, the suspects' proximity to the car, the suspects' moving away from it upon observation of the officers, and the high-crime character of the neighborhood (Officer Phillips candidly acknowledged that in his opinion everyone was a suspect in that area.)

The officers decided that they would park at the end of the block and "let them come to us," reasoning that they lacked sufficient evidence to detain or arrest and that the suspects would be easier to contain inside the vehicle.

Shortly afterwards, the car came down the block with one occupant in it and without headlights. As it proceeded, the officers pulled behind it and activated their red light and siren. The vehicle accelerated; so did the officers. They then radioed that they were in pursuit, giving the vehicle's description and license number. There ensued a chase which lasted for approximately ten minutes and ended when the officers decided to crash into the pursued vehicle.[1] The officers purposely rammed their vehicle into the other car hoping to disable it. As a result of that impact, the unmarked police vehicle came to rest upon the sidewalk next to a school on the opposite side of the street. Guyton's vehicle apparently careened off a telephone pole, spun around in the street onto which it had commenced its turn, and ended up facing eastbound, the

---

1. It is significant that the officers, in recalling their activities earlier that evening, testified that they had been in a high-speed chase in which they lost their suspect.

opposite direction. It ultimately came to rest on the sidewalk and lawn of a house at the intersection, resulting in an impact with the house. It is what intervened between the car coming to its, first eastbound position and its final place of rest that is critical. It is also that interval that is the subject of much conflicting evidence.

Officer Mierkey testified that after the vehicle came to that first position he heard two shots very close together coming from the direction of the vehicle. Officer Phillips said he heard two reports of light gunfire from the victim's direction. Officer William Matthews, who had by then arrived on the scene in a marked patrol unit, claims that he saw a flash and a pop coming from the inside or near the driver's door of Guyton's car. Matthews had joined the chase and arrived close enough to the scene to observe the unmarked vehicle hit Guyton's. Another witness claims to have seen a flash in that area at or about the time of the shooting.

The two plainclothes officers Mierkey and Phillips, got out of their vehicle immediately. Phillips, in more colorful language than is necessary to repeat here, called to Mierkey that they were being shot at, and Mierkey immediately started firing as they pursued Guyton to a vacant lot at the corner. One officer says he saw Guyton standing near the back of the car he had exited (could see him over the "turtleback"), and the other officer says Guyton got out of the car, started to run, stopped, turned slightly facing the officers, and then the two shots were heard. Phillips testified that he heard the shots after he had got out of the car. Mierkey said he heard them while he was getting out. Officer Matthews said that when he arrived on the scene he saw Guyton standing near the left front door of the car Guyton had been driving. Its door was open. He rammed the rear of the vehicle, expecting to spin the car and hit Guyton with it. He says at the moment of impact Guyton started to run. The other officers were confused as to exactly when Matthews arrived and whether they ran past his car, Guyton's, or some other car in their pursuit of Guyton. Matthews then joined the foot chase. However, he somehow managed to get ahead of Mierkey and Phillips because Matthews was having the dirt kicked up under or near his feet by the shooting from Mierkey's weapon.

While all three officers claim to have heard reports of gunfire from the direction of Guyton, there are other facts upon which they also agree that are important. At no time did any of the officers see any weapon in Guyton's possession. At no time after Guyton turned around and started running and the officers began their pursuit did he turn back toward them. At no time did Guyton make any verbal threats or gestures other than the gunshots the officers claim to have heard. At no time at the beginning or during the pursuit did any of the officers call to Guyton to freeze or in any way attempt to stop him other than by firing their weapons.

In testifying about the frame of time in which he believed Guyton was firing on the other officers, Matthews says he saw the victim's arm outstretched and it appeared to be pointing toward the other police officers. This court finds that testimony unbelievable. Nowhere in his two statements immediately after the incident did Officer Matthews make mention of this fact. In other parts of his testimony, he states that upon arriving at the scene he did not see the other officers. That period of time coincides with the period of time that he claims he saw Guyton's arm outstretched and pointing at the other officers. It is impossible to see how he could have known Guyton was pointing in their direction if he had not yet seen them. Finally, if he could see the outstretched arm pointing toward the other officers, it is more likely than not he would have also seen a weapon. Yet he admits never having seen a weapon in Guyton's hand.

Phillips at trial claimed he could see Guyton's hand. In his statements taken shortly after the incident he says that he could not see Guyton's hands. Mierkey at all times has admitted that he never saw Guyton's hands or arms at the time of the firing.

In the course of the pursuit that followed, Mierkey fired approximately eight rounds. Eight casings attributed to his weapon were found at the scene. Phillips fired at least two times. One casing from his weapon was found at the scene. Another bullet from Phillips' gun entered the victim. Mierkey acknowledged that he may have fired two rounds into the side of Guyton's vehicle. The objective evidence is consistent with this conclusion. When these shots were fired cannot be determined from the evidence. However, it would appear that they were the first two shots fired by Mierkey.

The plaintiff has posited the theory that those were the two low-caliber sounding shots heard by several witnesses before the volley of shots. One police officer witness within audio range but not visual range referred to them at trial as "muffled," theorizing that their impact with the car might have dulled the sound. The defendants contend that these two lighter shots were fired by the victim. They suggest that they may have come from a .22-caliber firearm. There is insufficient evidence for the court to conclude whether either of these theories is more likely to account for the two lighter sounding shots.

Before concluding from all the evidence whether Guyton had a weapon, it is appropriate to return to the pursuit. One of the shots fired by Officer Phillips hit the victim in the buttocks. Guyton then began to buckle and proceed in a staggered run. He got to a sidewalk area and finally fell down in a driveway at the opposite side of a house facing on the vacant lot through which he had been pursued. Mierkey and Matthews went around the house. Mierkey apparently reached the victim first and was bending forward to hold Guyton and handcuff him when he heard a shot to the immediate left of his face. The shot was fired by Officer Matthews into the victim at a point slightly below the neck and six inches above the middle of the back.

Matthews has contended that he believed that the victim was armed and that he was rising from the ground in an attempt to shoot him. Matthews demonstrated for the court the manner in which the victim was moving. Mierkey recalled being shocked by the shot and saying to Matthews "Jesus Christ, Bill." Another officer, Officer Sprague of the Oakland Police Department, arrived on the scene in time to witness this last shot. He testified that he was surprised and that he had observed no threatening movements of the victim that would warrant the action taken. It is also significant that Mierkey, who had been involved in the chase of the victim much earlier than Matthews, was preparing to merely hold and handcuff him.

At this point, several officers from the Oakland Police Department and the Emeryville Police Department arrived on the scene. An ambulance was called. A search for evidence including the purported gun in the victim's possession was conducted. A canvassing of the neighborhood for witnesses was made.

The victim died at 10:40 p. m. the evening of the incident. He died of two gunshot wounds fired by Phillips and Matthews respectively. The first would have caused death to occur within ten to fifteen minutes of its infliction. The second resulted in death within five minutes of its infliction.

No firearm was found on the victim. None was found at the scene. (There was a rifle found in the front of the car that Guyton had been driving. However, it is not contended by any party that the rifle was at any time used by Guyton.) No one ever saw a firearm in Guyton's possession. There were no casings or other indicia of firing of any weapons found at the scene other than those of the officers.

Subsequent tests of Guyton's hands were performed to determine whether he had fired any weapon. The court finds those tests reliable. The tests were negative for barium and antimony residues that would be left by the firing of most firearms. The only likely exception consistent with these findings is the firing of a .22-caliber weapon. Most of the ammunition available for that weapon would not cause the residue that would be revealed by the tests per-

formed. It is that kind of firearm and ammunition that the defendants contend Guyton had used. This is speculation and only rises to the level of probability if the testimony of the officers is believed. This court finds their testimony that Guyton was firing on them lacks credibility. It is not consistent with or supported by the objective evidence.

The testimony of other witnesses as to the first shots fired, whether Guyton had a gun, and whether the officer shot first is of little help. With the exception of one witness who said she saw a flash near Guyton's car, none of the other witnesses actually saw that part of the incident. Most of the testimony of civilian witnesses regarding what they heard and what they saw related to events that transpired after the shooting commenced. Their testimony was substantially inconsistent with prior statements of these same witnesses and with each other's. One witness, Fletcher Grimes, provided a dramatic, detailed and unique recounting of the event. This court has discounted his testimony in its entirety. Mr. Grimes is a witness who recently surfaced, never before having talked to any police, attorneys, or investigators of the district attorney's office despite their repeated attempts to locate witnesses to the incident. His recitation of the events, highly favorable to plaintiffs, bore little resemblance to anyone else's recollection. Mr. Grimes has a lengthy criminal record and a history of mental illness. The court has not considered any of his testimony in arriving at its findings.

For the reasons set forth above, this court finds that the objective evidence does not support the contention of the officers that Guyton had a firearm. The preponderance of the evidence shows that he did not have a firearm and that he did not fire upon the officers.

Plaintiff brought this action on behalf of her deceased son pursuant to 42 U.S.C. §§ 1983 and 1985. The matter was tried to the court without a jury.

■ Plaintiff has failed to establish by a preponderance of the evidence that the de-

fendants or any of them participated in a conspiracy, much less that there was a conspiracy motivated by a class-based discriminatory animus. *Griffin v. Breckenridge*, 403 U.S. 88, 101–03, 91 S.Ct. 1790, 1797–1799, 29 L.Ed.2d 338 (1971).

In order to establish a claim under 42 U.S.C. § 1983 plaintiff must show that some person has deprived him of a federal right and that the person who did so acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). There is no dispute that the defendants at all times complained of were acting under color of state law.

The other elements of this claim have been more fully explicated in cases where there have been claims of denial of procedural due process than in cases of excessive force. *See Chavis v. Rowe*, 643 F.2d 1281, 1288 (7th Cir. 1981). Indeed, murkiness abounds in excessive force cases. Few, if any, spell out the necessary elements and burden of proof. Often it is not possible to determine what standard the trial court used. This court, too, wrestles with the problem of what standard comports with *Gomez*.

*Gomez* is the Supreme Court's most recent expression of what a plaintiff must allege and prove in a § 1983 case. Prior to that decision the circuits were not in accord on the question of what comprised the plaintiff's case. The First Circuit had held that in addition to showing a deprivation under color of state law, the plaintiff must allege and prove bad faith if the claim was against a person entitled to the qualified immunity or good faith defense. *Gaffney v. Silk*, 488 F.2d 1248 (1st Cir. 1973); *Stadium Films, Inc. v. Baillargeon*, 542 F.2d 577 (1st Cir. 1976); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977). In *Gomez* this would have required that the petitioner who was discharged from his position as a police agent, in part because of unlawful wire tap activities which later were found to lack probable cause for his arrest, plead and prove that the employer was motivated by bad faith.

Adopting the view held by the majority of the circuits, including the Ninth, the Supreme Court ruled that qualified immunity or good faith is an affirmative defense that must be pleaded by the defendant. *See Gilker v. Baker*, 576 F.2d 245 (9th Cir. 1978).

■ In the context of excessive force cases, the defense is more properly characterized as an objectively reasonable belief that the conduct was lawful. In other words, the officer had a reasonable, good-faith belief that it was necessary (i.e., lawful) to employ the amount of force used in order to effect an arrest or prevent a suspect from fleeing. Whether characterized as qualified immunity, good faith or that it was necessary (i.e., lawful) to employ the amount of force used in order to effect an arrest or prevent a suspect from fleeing, it is an affirmative defense that the defendant official must plead and prove.

Yet with little analysis, even after *Gomez*, courts continue to refer to the plaintiff proving that he was "subjected to excessive force by the police officers." *Roberts v. Marino*, 656 F.2d 1112, 1114 (5th Cir. 1981).

■ This court is convinced that the only rational allocation of proof in light of *Gomez* is to require that the plaintiff prove that he was knowingly and intentionally shot (or beaten, kicked, or subjected to other physical acts that caused the injury) and that it was done under color of state law. The burden then shifts to the defendant to prove that the shooting was justified. If the defendant makes a *prima facie* case that the officers acted under the reasonable belief that their conduct was lawful, the burden of persuasion shifts to the plaintiff to show that the force was excessive. However, the burden of proof on the affirmative defense never leaves the defendant. Plaintiff is not required to carry the burden of establishing that the force was excessive.

To hold otherwise would require that the plaintiff assume the responsibility of proving a part of the defendants' affirmative defense, for, in proving that the force was excessive, plaintiff would be called upon to show that the defendants used more force than was necessary or lawful to effect an arrest. Essentially this would relieve the defendants of establishing in the first instance that the force that was used was reasonable or necessary. Thus, in a warrantless arrest it is necessary for the defendants to show that a misdemeanor was committed in their presence or that a felony was committed by the suspect and that the amount of force used was lawful under the applicable test, i.e., was not excessive.

■ In less specific terms, this proposition finds support in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 456 F.2d 1339 (2d Cir. 1972). There the court held that a police officer "must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable." *Id.* at 1348. Reasonableness or lack of excessive force is the sine qua non of lawful conduct in a case where use of police force is an issue. Therefore, this court concludes that when a plaintiff shows that the officer while acting under color of state law intentionally or knowingly shot him, a deprivation of constitutional rights has been shown, and the officer has the burden of justifying his conduct. *See Russ v. Ratliff*, 538 F.2d 799 (8th Cir. 1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); *Spears v. Conlisk*, 440 F.Supp. 490 (N.D.Ill.1977).

Plaintiff has met her burden in this case. In fact, this court concludes that even if plaintiff were required to establish excessive force as a part of her burden of proof, she has done so. It is the defendants' responsibility to justify their willful acts. The affirmative defense of justification is the officer's good faith belief in the reasonableness of his conduct. The nature of this defense is described in *Landrum v. Moats*, 576 F.2d 1320 (8th Cir.), *cert. denied*, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978):

> If police officers (1) believe that a certain amount of force is necessary to make an arrest, (2) believe that use of that amount

of force is lawful under the circumstances, and (3) have reasonable grounds for each of the foregoing beliefs, then they are entitled to the defense of good faith even if the use of force turns out, *ex post*, to have been illegal or excessive.

*Id.* at 1327.

It is federal law that governs and determines the sufficiency of the defense. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jones v. Marshall*, 528 F.2d 132 (2d Cir. 1975); *Qualls v. Parrish*, 534 F.2d 690 (6th Cir. 1976). Applicable federal standards have been described in general terms. Conduct that affords "brutality the cloak of law," *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 210, 96 L.Ed. 183 (1952), or "shocks the conscience," *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed. 324 (1973), offends due process guarantees and qualified immunity privileges of § 1983.

The actual parameters of permissible use of force have not been easily susceptible of description. Courts have consistently held that police officers are subject to federal constitutional standards. *Jones v. Marshall, supra.* In defining those standards, they have resorted to the broad generalizations of *Rochin v. California, Johnson v. Glick,* and *Rosenberg v. Martin*, 478 F.2d 520 (2d Cir.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973). They have looked to the American Law Institute (ALI) Model Penal Code for more concrete definitions of what circumstances justify a police officer's use of deadly force. Finally, and appropriately, courts have looked to state law to determine what amount of force is lawful and whether reasonable grounds for their good faith belief exist. *Qualls v. Parrish, supra; Landrum v. Moats, supra; Jones v. Marshall, supra; Clark v. Ziedonis*, 513 F.2d 79 (7th Cir. 1975).

■ The pattern of this analysis recognizes that state law may not be used to allow an officer to escape liability for a deprivation of constitutional rights, privileges, or immunities. However, an officer should be entitled to rely, in good faith, upon state law in performing his duties. Thus it is necessary to look to the law of the state of California to determine whether that law is adequate to protect federal civil rights and, if so, whether the officers acted in conformity with that law.

The pertinent statutory provisions are §§ 196, 197, 835a, and 837 of the California Penal Code. Sections 196 and 197 set forth circumstances under which homicide is deemed justifiable. As it pertains to public officers, § 196 provides in applicable part that:

Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either—

. . . . .

2. When necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other duty; or

3. When necessarily committed in retaking felons who have been rescued or have escaped, or when necessarily committed in arresting persons charged with felony, and who are fleeing from justice or are resisting such arrest.

Section 835a of the Penal Code provides that:

Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent escape or to overcome resistance.

A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.

These sections have been interpreted as prohibiting

the use of deadly force by anyone, including a police officer, against a fleeing felony suspect unless the felony is of the

violent variety, i.e., a forcible and atrocious one which threatens death or serious bodily harm, or there are other circumstances which reasonably create a fear of death or serious bodily harm to the officer or to another.

*Kortum v. Alkire*, 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26, 31 (1977).

The touchstone is the reasonableness of the force used. Reasonableness must be viewed in light of all the circumstances existing at the time of the incident. It is not based on hindsight. It must take into consideration alternative measures that may be used to prevent escape of a fleeing felon short of the drastic recourse of deadly force.[2]

Thus, the construction given to California statutes renders them compatible with federal constitutional standards.[3] *Jones v. Marshall, supra; Clark v. Ziedonis, supra; Landrum v. Moats, supra; Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir. 1976), *vacated and remanded on other grounds sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1971).

In this case we must also deal with the additional responsibility, if any, placed on the defendants by the regulations of their own police department. Those regulations are more than a mere police manual adopted by the police department setting forth departmental policy. They are more than mere guidance for the officers. They are regulations adopted by the city council of the Town of Emeryville in the form of a resolution, Resolution No. 67–68 adopted June 19, 1967.

Article 11, section 7 of the California Constitution, adopted in 1970, and its predecessor, article 11, section 11, gives cities (towns were specifically included in the former section 11) the power to enact ordinances and regulations. These ordinances and regulations have the full force and effect of law so long as they are not inconsistent with or displaced by general state law. *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 140, 130 Cal.Rptr. 465, 473, 550 P.2d 1001, 1009 (1976).

Resolutions are legislative enactments entitled to the same recognition as ordinances. *Crowe v. Boyle,* 184 Cal. 117, 149, 193 P. 111, 124 (1920); *Central Mfg. District, Inc. v. Board of Supervisors,* 176 Cal.App.2d 850, 1 Cal.Rptr. 733 (1960). California Government Code § 811.6 is also instructive. It provides in the context of claims and actions against public entities that:

> "Regulation" means a rule, regulation, order or standard, having the force of law, adopted by an employee or agency of the United States or of a public entity pursuant to authority vested by constitution, statute, charter or ordinance in such employee or agency to implement, interpret, or make specific the law enforced or administered by the employee or agency.

Considering all of this background, it is clear that the regulations for the Emeryville Police Department in effect at the time of this incident were also a part of the body of law governing the conduct of the defendant officers.[4] Therefore, it is appro-

---

**2.** *Mattis v. Schnarr,* 547 F.2d 1007, 1020 (8th Cir. 1976), *vacated and remanded on other grounds sub nom. Ashcroft v. Mattis,* 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

**3.** In fact, the suggestion in *Mattis v. Schnarr* is that a statute that does little more than codify the common law does not meet constitutional muster. 547 F.2d at 1012, 1019–20. California's statutes come within that purview but appear to be rescued by the state court's interpretation of them.

**4.** The evidentiary force to be given regulations of a police department was recently considered by the California Supreme Court. The Court held that police department regulations promulgated by the city manager and the police chief were entitled to treatment as a "statute, ordinance or regulation of a public entity" within the meaning of § 669 of the California Evidence Code. *Peterson v. City of Long Beach,* 24 Cal.3d 238, 155 Cal.Rptr. 360, 594 P.2d 477 (1979). Section 669 provides that:

> (a) The failure of a person to exercise due care is presumed if:
> (1) He violated a statute, ordinance, or regulation of a public entity;
> (2) The violation proximately caused death or injury to person or property;
> (3) The death or injury resulted from an occurrence of the nature which the statute,

priate to look to those regulations in determining the reasonableness of defendants' actions. The pertinent regulations provide that:

> Officers shall not discharge firearms in connection with police duty except under the following circumstances:

> . . . . .

> C. When necessary in the defense of their own lives when all other available means have failed.

> D. When necessary in the defense of another person's life when all other available means have failed.

> E. When necessary to effect the capture of, or prevent the escape or rescue of, a person whom the member has reasonable cause to believe has committed a felony, except for felony violations of the vehicle code, when all other available means have failed.

Police Regulation No. 107.

Another regulation of interest here is Police Regulation No. 113, which provides that "on-duty officers operating police vehicles shall drive in a reasonable and prudent manner."

Police Regulation No. 107 is more specific than the generalized language used in *Kortum* and in most federal cases. It clearly delineates under what circumstances firearms, i.e., deadly force, may and may not be used. The officer is not acting under a cloud of uncertainty when he decides to fire or use deadly force. However, in fact, the regulations add little to the federal standards already laid down. For in practice most courts have reached a result similar to the provisions of the Emeryville Police Department regulations.

For example, in *Qualls v. Parrish, supra,* the use of deadly force was found justified where the suspects were believed to have been involved in a kidnapping; a high-speed chase resulted; and immediately prior to the firing of his weapon, the officer, standing outside his vehicle, had nearly been struck by the suspects' fast-moving car. The officer's conduct was considered justified under Tennessee law, which permitted deadly force to be used if the felony suspect could not be taken or held by less drastic means.

The Eighth Circuit in *Landrum v. Moats, supra,* found as a matter of law that deadly force was unreasonable per se and therefore excessive under § 1983. That finding was based on the Nebraska statutes that explicitly provide that use of deadly force against fleeing nonviolent felons is not justified. The Nebraska provisions substantially parallel the California case law as laid down in *Kortum v. Alkire, supra.*

A similar conclusion was reached in *Clark v. Ziedonis,* 368 F.Supp. 544 (E.D.Wis.1973), aff'd, 513 F.2d 79 (7th Cir. 1975), where an officer shot two fleeing youths. The officers believed the youths had committed a felony and that they were carrying weapons. The court, after weighing the evidence, applied the rule that flight of a felony suspect does not warrant use of

---

ordinance, or regulation was designed to prevent; and

(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

(b) This presumption may be rebutted by proof that:

(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; . . . .

Rules governing presumptions and burdens of proof are generally regarded as matters of substantive law. *Johnston v. Pierce Packing Co.,* 550 F.2d 474, 476 n.1 (9th Cir. 1977).

Plaintiff might have availed herself of the provisions of § 669 in this court, but that issue need not be reached since it was not raised at trial and plaintiff has met her burden of proof without the benefits of the presumption. It is of significance solely for the purpose of understanding the measure of reasonable conduct that the courts of the state are willing and likely to apply. Here it would not be necessary to resort to the reasoning engaged in in *Peterson.* It was clear well before *Peterson*'s interpretation of § 669 that regulations adopted by the legislative body of a public entity come within the section's purview. *Vallas v. City of Chula Vista,* 56 Cal.App.3d 382, 128 Cal.Rptr. 469 (1976).

**1164**

deadly force. The holding was based on federal case law and a Wisconsin statute less compelling than California law. It was affirmed as proper under either the traditional common law view or a modified version of the privilege as adopted in the ALI Model Penal Code provisions. 513 F.2d at 83. A like result was reached based on Louisiana law, which permits deadly force to be used against a felon only if life itself is endangered or great bodily harm threatened. *Sauls v. Hutto,* 304 F.Supp. 124 (E.D. La.1969).

■ In this case young Guyton was first observed in a situation that aroused the officers' suspicions. It was appropriate at that time for the officers to investigate and prevent a crime from occurring, or to make an arrest if the crime was already in progress. Instead, the officers decided to "take the suspects" after they got into the car, thereby setting in motion a high-speed chase and the fateful events of that evening. Common sense and reasonable police practices caution against this kind of conduct. Accepted police practices do not approve of placing a higher value on the making of arrests than on intervening before a crime is actually committed. The obligation of the officer is to protect lives and property, not to unnecessarily put them in jeopardy. A suspect who may be the target of investigation or may be about to be arrested is entitled to the same protection. To hold otherwise is to deny an accused the presumption of innocence and the panoply of protections guaranteed by the Constitution.

In this case the decision of the officers to pursue Guyton by car came on the heels of an earlier fruitless high-speed chase. It showed a callous disregard for the obligations of their office and of the regulations by which they were governed. The immediate foreseeable result was a violation of those regulations (failure to operate a police vehicle in a reasonable and prudent manner, P.R. No. 113), which amounted to unreasonable, imprudent conduct. For the reasons set forth in detail above, the inescapable conclusion is that the conduct of the officers in firing upon Guyton was excessive, unreasonable, and unjustified.

■ It is axiomatic that a police officer's use of excessive force resulting in death constitutes a deprivation of fundamental rights. *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); *Spence v. Staras,* 507 F.2d 554, 557 n.2 (7th Cir. 1974); *Putman v. Gerloff,* 639 F.2d 415, 421 n.6 (8th Cir. 1981); *Landrum v. Moats, supra; Clark v. Ziedonis,* 513 F.2d at 80 n.1; *Spears v. Conlisk, supra.* Having found civil liability by reason of the defendants' acts, it is necessary to determine the measure of damages.

■ A claim for deprivation of civil rights which accrued before death survives the decedent where there is a state law providing for survival. *Brazier v. Cherry,* 293 F.2d 401 (5th Cir.), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Robertson v. Wegmann,* 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978); *Spence v. Staras, supra;* and *Roberts v. Rowe,* 89 F.R.D. 398 (S.D.W.Va.1981).

California law provides for survival of certain actions in Probate Code § 573. It is undisputed that it applies in this case and by reason of its provisions this action survives and may be brought by the decedent's administratrix. However, that does not put the survival issue to rest. Plaintiff offers several theories upon which she may recover damages. Some of those damages are not recoverable under § 573. Section 573 limits the damages that may be recovered to "... such loss or damage as the decedent sustained or incurred prior to his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he lived, and shall not include damages for pain, suffering or disfigurement."

Two questions present themselves. Does the decedent's claim survive without reference to state law? If the claim survives solely by reason of the state statute, is plaintiff's recovery in a federal civil rights action under § 1983 limited to those damages permitted by the state survival statute?

One possible answer to the first question is that the claim survives by reason of a federal common law rule of survival. This approach has been taken in maritime cases where there is a comprehensive body of federal statutory law to protect seamen and their families. When these statutes have been found wanting, courts have looked to the substantial number of state wrongful death and survival statutes and fashioned remedies under general maritime law. *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 883 (1974); *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980).

Courts that have found federal statutory law inadequate and have concluded that there is a federal maritime survival action have included pain and suffering as an element of recovery. *Barbe v. Drummond*, 507 F.2d 794 (1st Cir. 1974); *Law v. Sea Drilling Corp.*, 510 F.2d 242, *rehearing denied*, 523 F.2d 793 (5th Cir. 1975). Consideration was given to the deficiencies of federal and state statutory provisions, the general common law, the recovery provided for by the majority of state survival statutes, and the policy of uniformity.

The Supreme Court reiterated this principle in *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Where there is a "significant conflict between some federal policy or interest and the use of state law," *id.* at 1790, *quoting*, *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966), it may under certain limited circumstances be necessary to develop federal common law.

In actions under the Civil Rights Act of 1871 courts have ordinarily looked first to state survival statutes. The reason for this is found in 42 U.S.C. § 1988, which provides that when federal laws

are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause ....

Generally these statutes have not been found deficient insofar as they permit the action to survive. *Brazier v. Cherry, supra; Spence v. Staras, supra; Hall v. Wooten*, 506 F.2d 564 (6th Cir. 1974); *Roberts v. Rowe, supra*.

*Robertson v. Wegmann, supra*, is an exception to this trend. There, although there was a Louisiana survival statute, the Supreme Court found the § 1983 action did not abate because no person with a relationship to the decedent required by the statute survived. In that case the Fifth Circuit had found that the state law was inconsistent with federal law and created a federal common law of survival. The Supreme Court reversed, but pointed out that its holding was a narrow one. It reasoned that its decision did not adversely affect the policies underlying § 1983. The cause of action, it noted in that case, was one that arose before death and was not based upon any facts that were alleged to be the cause of or related in any way to the death. The majority was careful to point out that "We intimate no view, moreover, about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." 436 U.S. at 594–95, 98 S.Ct. at 1997.

This court can find no cases where a cause of action for deprivation of civil rights did not survive when the actions giving rise to the claim were also the cause or a contributing factor to the death of the decedent. The likely reason for the absence of cases is that most states have survival statutes. *See generally* S. Speiser, *Recovery for Wrongful Death*, § 14:1 et seq. (2d ed. 1975). Federal decisional law leaves little doubt that if there were no applicable state survival statute the action would not be permitted to abate. Otherwise the pur-

pose of the Civil Rights Act of 1871 would be thwarted. *See Robertson v. Wegmann,* 436 U.S. at 593 n.11, 594, 98 S.Ct. 1997 n.11, 1997; *Hall v. Wooten,* 506 F.2d at 569; *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Jones v. Hildebrant,* 432 U.S. 183, 190, 97 S.Ct. 2283, 2287, 53 L.Ed.2d 209 (1977) (White, J., dissenting).

Most courts that have spoken to this issue have addressed it in the context of whether the action survives. Therefore, there are few cases that have considered whether limitations on the scope of recovery contained in state survival statutes may be used to limit recovery in § 1983 actions. Those that have adopt the view that the state statute should not be allowed to limit the broad remedial purposes of the Civil Rights Act of 1871. *Basista v. Weir,* 340 F.2d 74 (3d Cir. 1965); *Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967); *Caperci v. Huntoon,* 397 F.2d 799 (1st Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968). *See also Spence v. Staras, supra; Roberts v. Rowe, supra.*

This court considers the better view to be that claims arising under § 1983 survive as a principle of federal common law without regard to state law. That view takes into consideration the need for a uniform policy of survival and damages. It recognizes the remedial purposes of the Act. It also eliminates the need to refer to, analyze, and rationalize state statutes that were not enacted in contemplation of the Act or its intent. This view has been suggested by Justice White in his dissent in *Jones v. Hildebrant, supra,* by Justice Powell in his dissent in *Carlson v. Green, supra,* and by Justice Wisdom in *Shaw v. Garrison,* 545 F.2d 980 (5th Cir. 1977), *reversed sub nom. Robertson v. Wegmann, supra. See also Wood v. Strickland,* 420 U.S. 308, 95 S.Ct.

992, 43 L.Ed.2d 214 (1975); *Lefton v. City of Hattiesburg, Mississippi,* 333 F.2d 280 (5th Cir. 1964); *Furtado v. Bishop,* 604 F.2d 80, 96–99 (1st Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

■ However, taking heed of the guidance offered by the majority in *Robertson,* this court follows what appears to be the present interpretation of § 1988.[5] 436 U.S. at 593–94 n.11, 98 S.Ct. 1996, 1997 n.11. Therefore, we look to the state statute, and if an inconsistency with federal law is found, we look to federal common law. This court is persuaded by the intent of the Act, the narrow ruling and discussion by the Supreme Court in *Robertson,* and the holdings in *Basista v. Weir, supra,* and its progeny, that California's survival statute, insofar as it excludes recovery for pain and suffering, is inconsistent with § 1983. Its restrictions on recovery are significantly inhospitable to the policies fostered by the Act.

To deny recovery for pain and suffering would strike at the very heart of a § 1983 action. The same result should apply to out-of-pocket expenses such as medical, funeral, and burial expenses. Under § 573 of the Probate Code, the only recoverable damages in a case such as this would be punitive damages. Had the victim survived, he could have recovered, among other things, loss of earnings and pain and suffering. The inescapable conclusion is that there may be substantial deterrent effect to conduct that results in the injury of an individual but virtually no deterrent to conduct that kills its victim.

It is also important to note that pain and suffering sustained prior to death is recoverable in a majority of jurisdictions.[6]

---

5. For a cogent argument toward a more restrictive application of 42 U.S.C. § 1988 see Eisenberg, *State Law in Federal Civil Rights Cases: The Proper Scope of Section 1988,* 128 U.Penn. L.Rev. 499 (1980).

6. S. Speiser, *Recovery for Wrongful Death,* § 14.8 (2d ed. 1975), identifies the following jurisdictions as having survival statutes or hybrid survival-wrongful death statutes that al-

low recovery for a decedent's conscious pain and suffering prior to death: Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Tennessee, Texas, Vermont, and Wisconsin, in

The testimony in this case supports a factual finding that for an approximate 15-minute period Tyrone Guyton consciously suffered pain. He was seen to stumble and fall and was heard making sounds. His death, though quick in occurring, was not instantaneous. The court should not avoid the problem of squaring the limitations of the state's survival statute with Civil Rights Act policy just because the period of pain and suffering was brief. An award of $15,000.00 for pain and suffering is appropriate in this case.

█ Loss of earnings and loss of society damages were also urged here. Under California law, a wrongful death action may be brought for these damages. Generally, loss of future earnings is a remedy in a wrongful death action, the only loss of earnings recoverable by the estate of the decedent being the loss occurring between injury and death. The latter is not in issue here.

It does not seem proper to consider loss of future earnings in this survival action. California law is not inadequate. *Galindo v. Brownell*, 255 F.Supp. 930 (S.D.Cal.1966). The fact that a wrongful death or § 1983 action was not pursued by the heirs of Guyton on their own behalf is not a reason to award in this action damages that might have been recovered had such an action been brought.[7]

There is no reason to carve out an exception in this case when appropriate remedies were available and were not precluded by state law. The California law is not peculiar in this regard. Generally, survival actions allow recovery only for medical expenses, funeral and burial expenses, loss of earnings from time of injury to death, and conscious pain and suffering. In most jurisdictions heirs or personal representatives may sue on their own behalf in a wrongful death action for loss of future earnings. Speiser, *supra*, at 14:6 et seq.

As noted above, this court finds that plaintiffs are entitled to recover medical, funeral, and burial expenses. The amount of recovery proved to the satisfaction of this court is $487.35.

The court is still faced with an anomalous result in this survival action. The clear purpose of § 1983 is to prevent abuse of official acts that cause deprivation of rights. Yet that purpose is hardly served when the police officer who acts without justification suffers a harsher penalty for injuring or maiming a victim than for killing him. The court must be able to fashion a remedy that will fit the penalty to the deprivation and will serve as a deterrent to abusive conduct in the future.

A remedy must obtain by reason of the actual deprivation—in this case the greatest of deprivations, loss of life. Absent such a remedy, the § 1983 action amounts to little more than a tort claim. "It is not clear, however, that common-law tort rules of damages will provide a complete solution to the damages issue in every § 1983 case." *Carey v. Piphus*, 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978).

The proposition that where federally protected civil rights have been deprived the federal courts may "use any available remedy to make good the wrong done," *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946), is unassailable. *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *McDonald v. Verble*, 622 F.2d 1227, 1234–35 (6th Cir. 1980).

*Carey* stresses the need to make an independent assessment of the measure of damages in § 1983 actions. Cases where the wrongful acts, which are the gravamen of a § 1983 claim, caused the death of the wronged person are particularly susceptible to this interpretation and give rise to presumed damages. The decedent's loss of life, which is the deprivation here, is a

---

addition to specific federal statutes and decisions under the general maritime law.

**7.** Plaintiff sues only in her representative capacity as an administratrix on behalf of her son. At trial the parties acknowledged that a

wrongful death suit was initiated in state court but was dismissed under California Code of Civil Procedure § 583(b) for failure to bring to trial within five years.

compensable injury that survives and is recoverable by his estate. This court concludes that the only just remedy that carries out the purposes of the Civil Rights Act of 1871 is an award of damages for the actual deprivation of right to life. Fixing an amount is difficult, but not speculative. It must be done with sensitivity to the overall scheme of the Act but without the highly charged emotion these cases tend to provoke. One measure of damages might be the value of the decedent's life as defined by future earnings. That measure is rejected. As has been pointed out earlier, future earnings are not recoverable in a survival action. To allow them under this theory in this action would distort the nature of survival and wrongful death statutes. Second, the result would be unthinkable. By the testimony of both plaintiff's and defendants' expert witnesses, the value of Guyton's future earnings would be less than that of white males of similar age and background. Admittedly, the reason for this is the disparate or discriminatory treatment of blacks in employment, education, health care, and other aspects of American society. It would be ironic that under the very Act that was intended to protect the rights of black citizens the measure of damages incorporated the proscribed discrimination. Therefore, this court concludes that it is appropriate to look at damages in other deprivation cases and arrive at an amount that fairly represents the loss of human life.

For the outrage of an arrest a plaintiff was awarded $5,000, *Rhoads v. Horvat*, 270 F.Supp. 307 (Colo.1967); humiliation, embarrassment, and discomfort substantiated an award of $750, *Sexton v. Gibbs*, 327 F.Supp. 134 (N.D.Tex.1970), *aff'd*, 446 F.2d 904 (5th Cir. 1971), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972); humiliation and mental distress for unlawful arrest, search, incarceration, and prosecution resulted in a jury award of $10,000 to a husband and $2,500 to his wife, *Konczak v. Tyrrell*, 603 F.2d 13 (7th Cir. 1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); to a person deprived of his liberty by an unlawful arrest an award of $5,000 was made, *Krueger v. Miller*, 489

F.Supp. 321 (E.D.Tenn.1977), *aff'd*, 617 F.2d 603 (6th Cir. 1980); for a deprivation of a prisoner's first amendment right to practice his religion an award of $3,000 was made, *Bryant v. McGinnis*, 464 F.Supp. 373 (W.D. N.Y.1978); and for a violation of the right to vote each plaintiff was awarded $2,000, *Wayne v. Venable*, 260 F. 64 (8th Cir. 1919).

Without appearing to minimize the value of life, but in order to assess a reasonable amount of damages, this court finds that plaintiff is entitled to recover as and for the deprivation of the decedent's constitutional right to life the sum of $100,000. The liability of defendants Phillips, Mierkey, and Matthews for the damages set forth above, pain and suffering, medical, funeral, and burial expenses, and deprivation of constitutional rights is joint and several.

It is necessary to consider whether plaintiff is entitled to an award of punitive damages. Punitive damages are recoverable to a representative suing in a survival action under Probate Code § 573. They are also recoverable in an action under § 1983. *Carey v. Piphus*, 435 U.S. at 257 n.11, 98 S.Ct. at 1049 n.11; *Spence v. Staras, supra; Basista v. Weir, supra; Gregory v. Thompson*, 500 F.2d 59, 65 (9th Cir. 1974); *Aldridge v. Mullins*, 474 F.2d 1189 (6th Cir. 1973).

The actions of Officer Mierkey, while unreasonable and unjustified, do not rise to the level of culpability of Officers Phillips and Matthews. They do not warrant an award of punitive damages as against Officer Mierkey.

This court cannot look so favorably upon the conduct of Officers Phillips and Matthews. The evidence conclusively establishes that they acted with callous disregard for the rights of Tyrone Guyton. This is especially true of Officer Matthews, who deliberately shot the decedent in the back of the neck. The response of others witnessing the incident was one of surprise or shock. The response of this court to the facts surrounding this incident is that defendant Matthews acted oppressively and with such extraordinary misconduct as to justify a

substantial award of punitive damages. The award of punitive damages against Officer Phillips is in a lesser amount, reflecting his less egregious conduct. In making these awards, the court is mindful of the financial ability of the defendants to respond in damages.

Punitive damages are awarded to plaintiff and against defendant Phillips in the amount of $35,000 and against defendant Matthews in the amount of $50,000.

The foregoing constitutes the court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

For the above stated reasons, IT IS HEREBY ORDERED that:

1) Plaintiff's claim under 42 U.S.C. § 1985 is dismissed as against all defendants and judgment will be entered accordingly;

2) Plaintiff shall recover of all defendants jointly and severally the sums of

　a) $15,000 as and for pain and suffering;

　b) $487.35 as and for medical and burial expenses;

　c) $100,000 as and for the deprivation of decedent's rights to life without due process of law;

3) Plaintiff shall recover of defendant Phillips the sum of $35,000 as and for punitive damages;

4) Plaintiff shall recover of defendant Matthews the sum of $50,000 as and for punitive damages;

5) Plaintiff may be entitled to recover attorney's fees upon a proper showing.